Chuck R. PATTESON, Appellant,

v.

Ray A.C. JOHNSON, State Auditor of Public Accounts for the State of Nebraska, in his official capacity, and individually, Appellee.

No. 82–2125.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 17, 1983.

Decided Nov. 16, 1983.

Paul L. Douglas, Atty. Gen., Sharon M. Lindgren, Asst. Atty. Gen., Lincoln, Neb., for appellee.

James B. Gessford of Perry, Perry, Witthoff, Guthery, Haase & Gessford, P.C., Lincoln, Neb., for appellant.

Before LAY, Chief Judge, and BRIGHT and ROSS, Circuit Judges.

BRIGHT, Circuit Judge.

Chuck R. Patteson, former Deputy Auditor of the Nebraska Office of Public Accounts, appeals from the district court's [1] judgment dismissing his civil rights action against defendant Ray A.C. Johnson, the Nebraska State Auditor of Public Accounts. Johnson discharged Patteson from his position as the Deputy State Auditor and Patteson brought suit claiming the discharge violated his constitutional rights of due process and free speech. Patteson also raised claims under Nebraska law. The district court denied all of Patteson's claims. We affirm the court's judgment on the due process claim, but vacate the judgment on the first amendment claim and his similar claim under Nebraska law.

I. *Background.*

Patteson, a certified public accountant, began working in the Nebraska State Auditor's Office in 1975. The following year Johnson promoted Patteson to Deputy Auditor. The Deputy Auditor ranks next to the State Auditor and in his absence may act in his place.

Sometime in 1978 or 1979, the Auditor's Office, under Johnson's direction, began following the American Institute of Certified Public Accountants' Generally Accepted Auditing Standards (CPA Standards). The Auditor's Office also began following the General Accounting Office's Auditing Standards (GAO Standards), and started issuing opinions with every audit. In addition, Johnson developed his own internal auditing standards. Johnson instructed his staff to follow all of these standards.[2]

On September 18, 1980, the Auditor's Office issued an audit on the operations of the Governor's Office from 1977 to 1980. The audit did not contain an opinion section, and for this reason failed to comply with the CPA Standards, the GAO Standards, or Johnson's own standards.[3] Several months later, in a March 1, 1981 story headlined, "Audit of Governor's Office Lacks Usual Endorsements," the Lincoln Sunday Journal and Star published an article asserting that the audit departed from the recently adopted accounting standards. The article noted that the audit "fails to discuss issues of potential embarrassment to Governor Charles Thone despite the fact that Johnson's staff members raised them during their audit." The article also noted that Thone and Johnson are both Republicans. Patteson, who was by this time a Republican candidate for State Treasurer, declined comment to the press.

Four days later, Patteson and Johnson, who also was a certified public accountant, attended a state senate committee hearing to testify on proposed legislation that would require the State Auditor to be a certified public accountant. Patteson appeared at the hearing at the invitation of the legislative committee of the Nebraska Society of Certified Public Accountants, which was supporting the legislation. As the hearing proceeded, it became apparent that the senators were going to inquire about the audit of the Governor's Office (Governor's Audit). At this point Johnson left the hearing, but did not ask Patteson to leave, and in fact did not give him any instructions.

---

1. The Honorable Warren K. Urbom, Chief Judge, United States District Court for the District of Nebraska.

2. Johnson told his staff that failure to follow these standards would subject them to discipline.

3. At trial, Johnson testified that this had been the first audit issued without an opinion since his office had adopted the new standards two years earlier. Neither Patteson nor the audit supervisor signed the audit, although both customarily did so. In addition, the audit did not contain the auditors' notes to the financial statements.

Patteson remained at the hearing and testified in favor of the proposed legislation. In the course of his testimony, the legislators asked questions about the Governor's Audit. In response to a question from Senator Chambers inquiring why Patteson had not signed the Governor's Audit, Patteson stated, "In my opinion the audit did not disclose everything it needed to disclose in order for me to sign it." After that Patteson avoided direct answers to Senator Chambers' questions that pressed for additional information about the audit.

At the urging of several senators, the Nebraska State Board of Accountancy (State Board) considered the audit of the Governor's Office, and, at its March 18, 1981 meeting, referred the matter to its Ethics and Standards Enforcement Committee for an investigation. The Committee, however, delayed its investigation, and requested the Attorney General to issue an opinion outlining the scope of the State Board's jurisdiction over the matter. On June 12, 1981, the Attorney General issued an opinion stating that the State Board had no jurisdiction over the matter. That same afternoon Johnson terminated Patteson's employment. Thereafter, Patteson filed for and unsuccessfully ran against Johnson for the position of State Auditor.

Alleging claims under 42 U.S.C. §§ 1983 and 1988, Patteson brought suit claiming his termination violated his fourteenth amendment procedural due process rights and his first amendment free speech rights. He also claimed that his termination violated state law. The district court denied Patteson's due process claim on the ground that Patteson had established no "legitimate claim of entitlement" to continued employment. The district court noted that no statute, written rule, or regulation granted a right to continued employment for the Deputy Auditor. In addition, the court ruled that custom or practice in the Auditor's Office was insufficient to vest any property interest in Patteson's continued employment.

Turning to Patteson's first amendment claim, the district court found "that a termination of the plaintiff's employment in mid-1981 would not have occurred if the plaintiff had not testified before the legislative committee." Although the district court found that Patteson's testimony constituted a substantial or motivating factor in the discharge, it nevertheless denied relief, concluding that the first amendment's protections did not extend to Patteson's speech. The district court summarily rejected Patteson's state law claims, observing that the reach of the state claims did not extend beyond the federal claims.

II. *Discussion.*

A. *Due Process.*

■ Individuals deprived of life, liberty or property by a state are entitled to procedural protections under the due process clause of the fourteenth amendment. *Board of Regents v. Roth,* 408 U.S. 564, 568, 92 S.Ct. 2701, 2704, 33 L.Ed.2d 548 (1972). In this case we are concerned only with an alleged deprivation of property. In *Roth* the Supreme Court stated that

[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. * * * It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims. [*Id.* at 577, 92 S.Ct. at 2709.]

Unless Patteson establishes a legitimate claim of entitlement to continued employment, his claim to procedural protections before dismissal must fail.

■ Patteson claims a property interest in his employment by reason of unwritten customs, policies, and understandings that existed in the Auditor's Office. In determining whether these practices constitute a "legitimate claim of entitlement" to continued employment, the district court properly looked to Nebraska law. Without deciding whether government employees generally have a property right to continued employment by virtue of custom or practice, the

district court concluded that no custom or practice of "sufficient stoutness" created a property right in Patteson's employment as Deputy Auditor. For the reasons stated in the district court's opinion, we affirm the denial of Patteson's due process claim.

### B. *Free Speech.*

Patteson also contends that his first amendment rights were violated. He argues, and the district court found as a factual matter, that he was fired in retaliation for testifying truthfully before the legislative committee.

■ A state cannot terminate public employees for exercising their first amendment rights. *See Pickering v. Board of Education,* 391 U.S. 563, 574, 88 S.Ct. 1731, 1737, 20 L.Ed.2d 811 (1968); *Keyishian v. Board of Regents,* 385 U.S. 589, 605–06, 87 S.Ct. 675, 684–85, 17 L.Ed.2d 629 (1967). Nevertheless, while employees do not relinquish their right to speak out on issues of public concern when they enter public service, those rights may be subject to the overriding interests of the state as an employer. Under the *Pickering* test, the court's task is to balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public service it performs through its employees." *Pickering, supra,* 391 U.S. at 568, 88 S.Ct. at 1734. In weighing these competing interests, courts are to consider both the nature of the employee's expression and the nature of the employment relationship. *See Connick v. Myers,* —— U.S. ——, 103 S.Ct.

1684, 75 L.Ed.2d 708 (1983); *Hughes v. Whitmer,* 714 F.2d 1407 (8th Cir.1983).

■ Applying the *Pickering* principles to this case, the trial court should have balanced the state's interest in ensuring the efficient operation of the Auditor's Office against Patteson's interest as a citizen, certified public accountant, and state official in truthfully testifying about pending legislation and responding to Senator Chambers' questions concerning the Governor's Audit. The district court, however, considered only the state's interest, and thus, incorrectly applied the *Pickering* balancing test.

The district court stated as to Patteson's testimony:

> In that testimony the plaintiff made it known that he thought the audit "did not disclose everything it needed to disclose in order for [him] to sign it." Later in campaign literature, when the plaintiff was running against the defendant for the office of Auditor of Public Accounts, he said that he had "refused to sign a shoddy, inaccurate audit." The disagreement between the plaintiff and defendant about the audit of the governor's office had been for several months before and at the time of the legislative testimony was deep and [devisive]. In that setting the testimony wherein the plaintiff indicated his ambition for the office held by the defendant, his declaring his competency as a Certified [Public] Accountant, and his statement of disagreement with his superior's decision regarding the audit of the governor's office became a significant interference with the operation of the defendant's office. As such, it was not protected speech.[4]

4. The later campaign statements cited by the district court appear irrelevant because they occurred after the discharge.

Additionally, the district court may have taken some of Patteson's comments out of context and interpreted them incorrectly. The court found that Patteson disrupted operations in the Auditor's Office by indicating in his testimony his ambition for Johnson's job and his competency as a certified public accountant to perform it. The evidence does not support that finding.

The legislative committee was considering a bill that would require the State Auditor to be a

certified public accountant. Patteson testified in favor of the bill, and said in his opening remarks,

> I'm a Deputy State Auditor. I'm a CPA. I have aspired to be the State Auditor. I think I probably will be in the future. So that probably makes me a little biased. I am biased because I am an auditor and I know what's involved in being an auditor. I know what it takes to do a good job of auditing.

After reviewing Patteson's testimony before the legislative committee, it is evident that Patteson simply intended to apprise the com-

By failing to consider Patteson's interest in testifying about pending legislation and responding to questions about the Governor's Audit, the district court failed to consider Patteson's comments on a matter of substantial public concern, and weighed only the disruptive effect of the speech on his relationship with his superior.[5] The court found support for its position in language in *Pickering* stating that significantly different considerations would be involved when "the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them." 391 U.S. at 570 n. 3, 88 S.Ct. at 1735 n. 3. Although special considerations certainly enter into the *Pickering* analysis when speech by especially trusted employees causes disruption and dissension within the government, we hold that the balancing test articulated in *Pickering* remains the proper standard. That test requires balancing of the employee's and the public's interest in free speech against the interest of the state in promoting the efficiency of the public services it performs through its employees. *Id.* at 568, 88 S.Ct. at 1734.

The Supreme Court's decision in *Connick v. Myers*, —— U.S. ——, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), supports this analysis and resolves any doubt about the applicability of the balancing test to high-level public employees. In that case an assistant district attorney, Myers, was dismissed for circulating to other attorneys in the office a questionnaire that included an inquiry about the attorneys' confidence in their su-

pervisors. *Id.* at 1687. Before applying the *Pickering* balancing test to determine whether Myers' speech was constitutionally protected, the Court specifically noted her status as an especially trusted employee, and observed that it was important "to the efficient and successful operation of the District Attorney's office for assistants to maintain close working relationships with their superiors." *Id.* at 1693. The Court ultimately struck the *Pickering* balance in favor of the Government, but it did so only after weighing the disruption in the office caused by the speech against the extent to which the questionnaire touched upon matters of public concern. *Id.* at 1694. Because Patteson's statements before the legislative committee must be evaluated under the *Pickering* balancing test, the district court erred in considering only the state's interests in its analysis.

■ Although the ultimate determination in whether speech is constitutionally protected is a question of law, *Connick v. Myers, supra* at 1690 n. 7 & 1692 n. 10; *Van Ooteghem v. Gray*, 628 F.2d 488, 492 (5th Cir.1980), we believe that in the present case the district court should have the initial opportunity to weigh the competing interests under the proper standard. Accordingly, the district court's opinion is vacated and remanded so that it may correctly apply the *Pickering* test.

In applying the *Pickering* analysis to this case, the district court should give special attention to the nature of Patteson's speech. As the Supreme Court stated in *Connick*, "the state's burden in justifying a particular discharge varies depending on the nature of the employee's expression."

mittee that as a certified public accountant interested in someday being state auditor, he would benefit from the proposed bill. Nothing in the record indicates that this statement was an affront to Johnson or reflected a then-present political ambition to run against Johnson.

5. Observing that Patteson held a special position of trust and confidence in the Auditor's Office, the district court noted,

[T]he relationship between [Patteson] and [Johnson] as subordinate and superior was

supposed to be, and needed to be for the effective running of the office, exceptionally close. [Patteson] was to act in the place of [Johnson] when [Johnson] was absent. [Patteson] assisted in the making and carrying out of policies of the office; [Johnson] depended upon him to discern and articulate to [Johnson] all kinds of matters relating to the office. As the closest associate in the office, [Patteson] occupied a special position of trust and confidence.

103 S.Ct. at 1691–92. In *Connick* the employee's expression was characterized as "an employee grievance concerning internal office policy," and accordingly was given little weight in the balancing test. *Id.* at 1693–94. In this case, however, Patteson's speech touched upon issues of public concern far weightier than those expressed in *Connick.*

Undoubtedly, Patteson's statement that the Governor's Audit "did not disclose everything it needed to disclose in order for [him] to sign it" related to a matter of substantial public concern. His testimony came within days after the press and the legislature had devoted significant attention to the Governor's Audit, and in particular to whether the audit report attempted to conceal certain expenses in the Governor's Office. Moreover, Patteson made the statement in response to a question by Senator Chambers, and nothing in this record indicates his testimony was other than truthful.

On the other side of the *Pickering* balancing test, the court must consider the state's interest in ensuring the efficient operation of the Auditor's Office. As the district court observed, the disagreement between Patteson and Johnson over the Governor's Audit was deep and devisive. The district court should weigh the disruptive effect of Patteson's legislative testimony upon the employment relationship against his right to testify upon pending legislation, his obligation to respond truthfully to legislative questioning, the public interest relating to the matter in controversy, and whether or not it was essential that he speak out, as he did, without fear of retaliatory dismissal. Accordingly, we remand to the district court for further consideration and application of the balancing test as enunciated in *Pickering* and *Connick.*

### C. *State Law Claims.*

Patteson also brings state law claims under § 20–148, Neb.Rev.Stat. (Reissue 1977).

This statute is very similar to 42 U.S.C. § 1983, and Patteson concedes that it applies only if this court finds that Johnson violated Patteson's constitutional rights. Because we affirm the district court's denial of Patteson's due process claim, we also agree that he cannot recover on that basis under § 20–148, Neb.Rev.Stat. However, to the extent that the state claims resting upon free speech principles stand dismissed because of the trial court's improper application of the balancing principles set forth in *Pickering* and *Connick,* that dismissal is vacated subject to further consideration by the district court.[6]

### III. *Conclusion.*

Accordingly, we affirm the district court's judgment on the due process claim, and vacate and remand the first amendment and similar state law claims for further consideration consistent with this opinion.

ROSS, Circuit Judge, concurring in part and dissenting in part.

I concur in the majority's analysis of the due process issue. However, it is my opinion that Patteson's testimony before the legislative hearing committee was not constitutionally protected speech and, as such, I would affirm the district court. When Patteson's remarks are viewed in light of the political nature of his appointment, the nature of his job, the necessity of a close working relationship with the appellee, the fact that the information was already public and may not have been of great public importance in any event, I must respectfully dissent from Part IIB of the majority's opinion.

The majority correctly defined the court's duty to balance the state's interest as an employer against Patteson's interest as a citizen, as mandated by the Supreme Court's holding in *Pickering v. Board of*

---

**6.** We reject Patteson's claim under state law that his dismissal violated Nebraska public policy. The district court ruled that even if Nebraska allows employees to claim they were wrongfully dismissed in violation of public policy, such a cause of action would not apply to this case. We see no reason to disturb this determination.

*Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). At 231. However, the majority then misapplied the *Pickering* principles to the facts of this case and consequently, in my view, erred in striking the balance for Patteson.

In *Connick v. Myers,* —— U.S. ——, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the Supreme Court recently clarified its position on how to properly apply the *Pickering* balance test in a case quite similar to this case. The majority should have applied the teaching of *Connick* to this case instead of trying to sidestep its analysis by an attempted distinction. At 232–233. This case involves an employment dispute between a subordinate and his superior. Because *Connick* is controlling and the district court opinion comports with *Connick,* I do not see the necessity of a remand.

The Court in *Connick* held that relevant considerations in applying the *Pickering* balance test are: 1) whether a close working relationship is necessary; 2) the manner, time and place in which the speech occurred; and 3) the context in which the dispute arose. All of these factors are germane in this case and require striking the balance in favor of the appellee. First, the necessity of a close working relationship between a deputy auditor and the state auditor who appointed him goes without saying. Second, the manner, time and place in which Patteson's remarks arose indicate his true motive in speaking to the legislative committee. Patteson was not requested by the committee to testify but volunteered such information after appellee had left the hearing. Moreover, his opening statement made it clear that he was giving a political speech which was certain to cause dissension within the office. At 231–232, n. 4. Third, in discussing the significance of the context in which the dispute arose, the Court in *Connick* stated:

When employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional weight must be given to the supervisor's view

that the employee has threatened the authority of the employer to run the office. *Id.* at 1693.

This statement is clearly applicable to Patteson's statements to the legislative committee. Patteson's speech arose from an employment dispute concerning office policy on signing the audit of the Governor's office. Shortly after Johnson and Patteson disagreed on the application of such policy to Johnson in this instance, Johnson voluntarily testified before the legislative committee. Thus, according to *Connick,* additional weight must be given to Johnson's view that Patteson had threatened his authority to run the office.

I believe that the majority misapplied *Connick* when they ignored one of the most important findings made by the district court. The district court stated:

The facts of the present case show that the relationship between the plaintiff and the defendant as subordinate and superior was supposed to be, and needed to be for the effective running of the office, exceptionally close. The plaintiff was to act in the place of the defendant when the defendant was absent. The plaintiff assisted in the making and carrying out of policies of the office; the defendant depended upon him to discern and articulate to the defendant all kinds of matters relating to the office. *As the closest associate in the office, the plaintiff occupied a special position of trust and confidence. Therefore, whatever would cause a material breach of that relationship was destructive to vital interests of the state.* Accordingly, the case fits the facts of *Sprague v. Fitzpatrick,* 546 F.2d 560 (C.A. 3rd Cir.1976), more closely than it fits *Van Ooteghem v. Gray,* 628 F.2d 488 (C.A. 5th Cir.1980). It must be remembered that even though the defendant knew in advance that the plaintiff was going to testify at the legislative hearing, and had no objection to that, he did not know what the plaintiff intended to say and did not know at the time he consented to the plaintiff's testifying that the plaintiff would testify about his disagree-

ment with the defendant's report of the audit of the governor's office of several months earlier. In that testimony the plaintiff made it known that he thought the audit "did not disclose everything it needed to disclose in order for [him] to sign it." Plaintiff's Exhibit 2, page 27. Later in campaign literature, when the plaintiff was running against the defendant for the office of Auditor of Public Accounts, he said that he had "refused to sign a shoddy, inaccurate audit." Defendant's Exhibit 105. The disagreement between the plaintiff and defendant about the audit of the governor's office had been for several months before and at the time of the legislative testimony was deep and devisive. In that setting the testimony wherein the plaintiff indicated his ambition for the office held by the defendant, his declaring his competency as a Certified Professional Accountant, and his statement of disagreement with his superior's decision regarding the audit of the governor's office became a significant interference with the operation of the defendant's office. As such, it was not protected speech.

(Emphasis mine.) The majority opinion cited part of the above passage. At 232, n. 5. However they did not cite, nor did they consider, the crucial factual and legal conclusion drawn by the district court: that appellant's conduct became "a significant interference with the operation of defendant's office" and that whatever caused a material breach of an exceptionally close relationship was destructive to the vital interests of the state. The district court discussed the very factors relied upon in *Connick* and reached a similar conclusion.

In sum, I find, as did the Supreme Court in *Connick*, that the limited first amendment interest involved here does not require that Johnson tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships. Patteson's dis-

charge therefore did not offend the first amendment and the judgment of the district court should be affirmed.