787 F.2d 1245
 Chuck R. PATTESON, Appellee,
v.
Ray A.C. JOHNSON, State Auditor of Public Accounts for the
State of Nebraska, in his official capacity and
individually, Appellant.
Chuck R. PATTESON, Appellant,
v.
Ray A.C. JOHNSON, State Auditor of Public Accounts for the
State of Nebraska, in his official capacity and
individually, Appellee.
 Nos. 84-1548, 84-1549.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 6, 1985.
Decided April 2, 1986.
 
 Sharon M. Lindgren, Lincoln, Neb., for Chuck R. Paterson.
 James B. Gessford, Lincoln, Neb., for Ray A.C. Johnson.
 Before HEANEY, Circuit Judge, HENLEY, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.
 PER CURIAM.
 
 
 1
 Ray A.C. Johnson appeals from the judgment of the United States District Court for the District of Nebraska granting relief to Chuck R. Patteson pursuant to 42 U.S.C. Sec. 1983. For the reasons set forth below, we affirm in part and reverse in part.
 
 I. BACKGROUND
 
 2
 These are the facts as recited by this Court in Patteson v. Johnson, 721 F.2d 228 (1983) (Patteson I ):
 
 
 3
 Patteson, a certified public accountant, began working in the Nebraska State Auditor's Office in 1975. The following year Johnson promoted Patteson to Deputy Auditor. The Deputy Auditor ranks next to the State Auditor and in his absence may act in his place.
 
 
 4
 Sometime in 1978 or 1979, the Auditor's Office, under Johnson's direction, began following the American Institute of Certified Public Accountants' Generally Accepted Auditing Standards (CPA Standards). The Auditor's Office also began following the General Accounting Office's Auditing Standards (GAO Standards), and started issuing opinions with every audit. In addition, Johnson developed his own internal auditing standards. Johnson instructed his staff to follow all of these standards.
 
 
 5
 On September 18, 1980, the Auditor's Office issued an audit on the operations of the Governor's Office from 1977 to 1980. The audit did not contain an opinion section, and for this reason failed to comply with the CPA Standards, the GAO Standards, or Johnson's own standards. Several months later, in a March 1, 1981 story headlined, "Audit of Governor's Office Lacks Usual Endosements," the Lincoln Sunday Journal and Star published an article asserting that the audit departed from the recently adopted accounting standards. The article noted that the audit "fails to discuss issues of potential embarrassment to Governor Charles Thone despite the fact that Johnson's staff members raised them during their audit." The article also noted that Thone and Johnson are both Republicans. Patteson, who was by this time a Republican candidate for State Treasurer, declined comment to the press.
 
 
 6
 Four days later, Patteson and Johnson, who also was a certified public accountant, attended a state senate committee hearing to testify on proposed legislation that would require the State Auditor to be a certified public accountant. Patteson appeared at the hearing at the invitation of the legislative committee of the Nebraska Society of Certified Public Accountants, which was supporting the legislation. As the hearing proceeded, it became apparent that the senators were going to inquire about the audit of the Governor's Office (Governor's Audit). At this point Johnson left the hearing, but did not ask Patteson to leave, and in fact did not give him any instructions.
 
 
 7
 Patteson remained at the hearing and testified in favor of the proposed legislation. In the course of his testimony, the legislators asked questions about the Governor's Audit. In response to a question from Senator Chambers inquiring why Patteson had not signed the Governor's Audit, Patteson stated, "In my opinion the audit did not disclose everything it needed to disclose in order for me to sign it." After that Patteson avoided direct answers to Senator Chambers' questions that pressed for additional information about the audit.
 
 
 8
 At the urging of several senators, the Nebraska State Board of Accountancy (State Board) considered the audit of the Governor's Office, and, at its March 18, 1981 meeting, referred the matter to its Ethics and Standards Enforcement Committee for an investigation. The Committee, however, delayed its investigation, and requested the Attorney General to issue an opinion outlining the scope of the State Board's jurisdiction over the matter. On June 12, 1981, the Attorney General issued an opinion stating that the State Board had no jurisdiction over the matter. That same afternoon Johnson terminated Patteson's employment. Thereafter, Patteson filed for and unsuccessfully ran against Johnson for the position of State Auditor.
 
 
 9
 Id. at 229-30 (footnotes omitted).
 
 
 10
 This is the second time this case has come before this Court. In Patteson I, Patteson appealed from the district court's judgment dismissing his fourteenth amendment due process claim and his free speech claims under the first amendment and Nebraska law. This Court affirmed the district court's judgment on the due process claim, but vacated and remanded its judgment on the free speech claims for consideration under Connick v. Meyers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). On remand, the district court held that Johnson had violated Patteson's first amendment rights.[1] It then found that since the law regarding the constitutional protection of Patteson's speech had not been clearly established at the time of Patteson's dismissal, Johnson was entitled to a good faith immunity from damages under Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). It went on to hold, however, that Patteson was entitled to equitable relief, namely reinstatement. The district court then stated that because of the friction between Johnson and Patteson, Patteson probably would not last longer than a few months after reinstatement. It therefore offered Johnson the choice of reinstating Patteson or paying him $10,800, an amount roughly equivalent to the value of the salary and benefits he could be expected to accrue.
 
 
 11
 On appeal, Johnson argues that his termination of Patteson did not violate Patteson's first amendment rights. On cross-appeal, Patteson argues that the district court granted only limited prospective relief, while he is entitled to full prospective relief from the date of the district court's judgment on remand.[2]
 
 II. DISCUSSION
 
 12
 A state cannot terminate public employees for exercising their first amendment rights. See Pickering v. Board of Education, 391 U.S. 563, 574, 88 S.Ct. 1731, 1737, 20 L.Ed.2d 811 (1968); Keyishian v. Board of Regents, 385 U.S. 589, 605-06, 87 S.Ct. 675, 684-85, 17 L.Ed.2d 629 (1967). Nevertheless, while employees do not relinquish their right to speak out on issues of public concern when they enter public service, those rights may be subject to the overriding interests of the state as an employer. Under the Pickering test, the court's task is to balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public service it performs through its employees." Pickering, supra, 391 U.S. at 568, 88 S.Ct. at 1734. In weighing these competing interests, courts are to consider both the nature of the employee's expression and the nature of the employment relationship. See Connick v. Myers, U.S. , 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); Hughes v. Whitmer, 714 F.2d 1407 (8th Cir.1983).
 
 
 13
 Patteson I, 721 F.2d at 231.
 
 
 14
 On remand, the district court found that Patteson's interests outweighed the state's and that his constitutional right to free speech had been abridged. It reasoned that "[a]s a citizen, as a deputy auditor, and as a CPA, Patteson had a legitimate and substantial interest in speaking his support for the proposed legislation and to speak truthfully in direct response to questions * * * on subjects, such as the Governor's audit, which related to that proposed legislation." Memorandum of Decision on Remand and Order of February 24, 1984 (Memorandum) at 3. It added that this was also a matter of substantial public concern. Id. The district court then observed that "the state in the person of State Auditor Johnson, had a legitimate and substantial interest in the efficient and successful operation of the public auditor's office." Id. at 3-4. It noted, however, that because the relationship between Johnson and Patteson prior to Patteson's testimony before the legislative committee had been "strained and fragile, * * * the state's interest in maintaining the kind of effectiveness his tenuous presence brought by the time he testified before the committee was moderate at best." Id. at 4. We agree with the district court's analysis.
 
 
 15
 After the district court found that Johnson had violated Patteson's first amendment rights, it focused on the issue of remedies. It stated that although Johnson is immune from liability for damages under Harlow, "[e]quitable relief is on a different footing. Reinstatement is in order, unless Patteson's presence would be so disruptive as to be contrary to the interests of all concerned." Memorandum at 5. It then reasoned that "reinstatement would be practically useless because of the weak relationship that existed between Patteson and Johnson" and predicted that "[i]f he were to be reinstated, the chances [were] excellent that he would not remain in place for more than a few months." Id. at 5. It therefore offered Johnson the choice of reinstating Patteson or paying him $10,800, "an amount representing the salary and other benefits Patteson would accrue if he were to be reinstated for the period he reasonably could be expected to remain." Id. at 6. It emphasized that "[t]he second alternative is not damages as such but an equitable substitute for a fruitless and ill-fated reinstatement."
 
 
 16
 A number of federal courts, including this one, have approved the award of monetary damages in lieu of reinstatement. See e.g., Davis v. Combustion Engineering, Inc., 742 F.2d 916, 922-23 (6th Cir.1984); Gibson v. Mohawk Rubber Co., 695 F.2d 1093, 1100 (8th Cir.1982). This form of relief should be used sparingly, however, because there is a danger that its use would allow employers to rid themselves, at will, of any employee, however impermissibly. In many instances, such relief would not adequately compensate the plaintiffs for the loss of their jobs, because plaintiffs are generally concerned not only about their pay, but also about job satisfaction. In this case, however, we find that the district court did not abuse its discretion in fashioning this remedy.
 
 
 17
 Patteson argues that in addition to reinstatement, or its monetary equivalent, he is entitled to full prospective relief from the date of the district court's judgment until his reinstatement or proper termination. The Supreme Court has held that an award "measured in terms of a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials" is barred by the eleventh amendment. See Edelman v. Jordan, 415 U.S. 651, 668-69, 94 S.Ct. 1347, 1358, 39 L.Ed.2d 662 (1974). Prospective relief, on the other hand, is not barred. Nevels v. Hanlon, 656 F.2d 372, 377-78 (8th Cir.1981). Accordingly, Patteson is entitled to prospective relief, including salary, accrual time for retirement vesting, and other benefits, from March 22, 1984, the date of the district court's judgment on remand, until such time as Patteson is either reinstated or receives the payment of damages in lieu of reinstatement. This prospective relief should be reduced by any salary or benefits Patteson has accrued in this period, in mitigation.
 
 
 18
 Accordingly, we affirm the judgment of the district court insofar as it found that Patteson's first amendment rights have been violated and ordered reinstatement or damages in lieu of reinstatement. We reverse to the extent that the district court failed to award prospective relief, and remand to the district court with directions to adjust its award consistent with this opinion.
 
 
 
 [1]
 Neb.Rev.Stat. Sec. 20-148 (Reissue 1977) provides, in relevant part:
 (1) Any person * * * who subjects * * * any citizen of this state * * * to the deprivation of any rights, privileges, or immunities secured by the United States Constitution or the Constitution and laws of the State of Nebraska, shall be liable to such injured person in a civil action or other proper proceeding for redress brought by such injured person.
 The district court found that Patteson's claim under this statute was coextensive with his section 1983 claim, and that relief should be the same for both.
 
 
 [2]
 Patteson also argued that in light of Neb.Rev.Stat. Sec. 20-148 (Reissue 1977) and Todd v. Bd. of Educ. Lands & Funds, 154 Neb. 606, 48 N.W.2d 706 (1941), the state has waived its sovereign immunity, and that he was therefore entitled to back pay and other benefits. This Court certified that issue to the Nebraska Supreme Court, which found that section 20-148 does not "constitute a waiver of sovereign immunity by the State of Nebraska for actions brought in federal court under 42 U.S.C. Sec. 1983 (1982)," Patteson v. Johnson, 219 Neb. 852, 367 N.W.2d 123, 126 (1985), and that Todd does not interpret any Nebraska statute as constituting a waiver of sovereign immunity for actions brought in federal court pursuant to a contract. Id. 367 N.W.2d at 128