**Dr. Judith PIESCO, Appellant,**

v.

**The CITY OF NEW YORK, DEPT. OF PERSONNEL, Juan Ortiz and Nicholas LaPorte, Jr., Appellees.**

**No. 1352, Docket 91–7037.**

United States Court of Appeals, Second Circuit.

Argued April 16, 1991.

Decided June 3, 1991.

1150

Ronald Podolsky, New York City, for appellant Dr. Judith Piesco.

Fay S. Ng, New York City (Victor A. Kovner, Corp. Counsel of the City of New York, Pamela Seider Dolgow and Paul Marks, New York City, on the brief), for appellees City of New York, Dept. of Personnel, Juan Ortiz and Nicholas LaPorte, Jr.

Before TIMBERS, MESKILL and PRATT, Circuit Judges.

TIMBERS, Circuit Judge:

Appellant Dr. Judith Piesco appeals from a summary judgment in favor of appellees the City of New York, Department of Personnel (DOP or the City), Juan Ortiz and Nicholas LaPorte, Jr. entered December 26, 1990 in the Southern District of New York, John S. Martin Jr., District Judge, dismissing appellant's civil rights action and pendent state law claims. 753 F.Supp. 468.

The chief issue pressed on appeal is whether the district court erred in dismissing appellant's first amendment claim. In asserting her claims of error, Dr. Piesco advances two principal contentions: (1) the district court improperly concluded that DOP's interest as an employer outweighed Dr. Piesco's first amendment interest in truthfully testifying before a legislative committee; and (2) since certain factual issues were unresolved, it was neither appropriate to consider conduct, other than her testimony before the committee, as a basis for the alleged retaliation, nor proper to conclude that her testimony was irresponsible as a matter of law.

A subordinate issue pressed on appeal by appellant is that appellees Ortiz and LaPorte are not immune from suit under 42 U.S.C. § 1983 (1988).

For the reasons which follow, we reverse that part of the judgment dismissing Dr. Piesco's first amendment claim. We affirm the dismissal of the pendent state law claims and the constitutional claims other than the first amendment claim.

I.

We shall summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal. Since this is an appeal from a summary judgment, we review the facts in the light most favorable to the non-movant, Dr. Piesco.

In September 1982, Dr. Piesco was appointed on a provisional basis to the position of Deputy Personnel Director for Examinations in the New York City Department of Personnel. In that capacity, she was responsible for the administration of the Bureau of Examinations, the largest bureau within DOP. The Bureau of Examinations is charged with the preparation, evaluation and administration of all civil service tests for the City of New York. During Dr. Piesco's tenure at DOP, the size of her staff fluctuated between 175–200 employees.

In December 1984, New York City administered examination no. 4061 for the position of police officer. Thereafter, in February 1985, Dr. Piesco and other administrators met to establish a passing grade for examination no. 4061. At that meeting, Police Department personnel advocated adopting a passing grade of 82, while Dr. Piesco urged that the passing grade be set at 89. Ortiz, then Personnel Director, ultimately decided to set the passing grade at 85. By setting the passing grade at that level, each successful candidate was required to answer correctly 119 of the exam's 140 questions. By contrast, had the passing grade been set at 89, successful candidates would have been required to answer at least 125 questions correctly.

In June 1985, Dr. Piesco and appellees Ortiz and LaPorte (the latter then being First Deputy Personnel Director) met with members of the New York State Senate Committee on Investigations, Taxation, and Government Operations (Committee). The Committee was conducting a review of the management of the New York City Police Department. While it is unclear who first used the word "moron", Dr. Piesco responded affirmatively when asked by a staff member whether it was possible for a moron to pass the police examination with the passing grade set at 85.

On July 11, 1985, Dr. Piesco and Ortiz appeared at a public hearing held by the Committee. Although not subpoenaed, the record indicates that the Deputy Chief Investigative Counsel for the Committee contacted Ortiz and informed him that if Dr. Piesco did not appear she would be subpoenaed. The transcript of the hearing reveals that Senator Goodman, Chairman of

the Committee, rejected Ortiz' request to be the sole spokesperson for DOP. Senator Goodman specifically requested that Dr. Piesco "testify directly". After she was duly sworn, the following colloquy ensued between Senator Goodman and Dr. Piesco:

SENATOR GOODMAN: Is it not a fact that under questioning by this Commission['s] staff you indicated that the written exam was so easy "that a moron could pass"?

DR. PIESCO: The conversation that we had was a very informal conversation, and if I used it as [a] characterization, I think it was rather unfortunate[.] I was not obviously aware of the [sic] that the conversation which was informal was in the way of cross examination.

I certainly would have modified my statement merely because the term "moron" is rather offensive and has certain technical meanings.

The answer to your question is yes.

. . . .

SENATOR GOODMAN: Would a functional illiterate pass the functional portion in the police academy?

[Although there exists some confusion concerning whether this question was correctly transcribed, it apparently is not disputed that the question posed to Dr. Piesco was "[w]ould a functional illiterate pass the entrance examination to the police academy?"]

DR. PIESCO: At the pass mark that is set, I would say that it is possible.

On July 12, 1985, one day following Dr. Piesco's testimony before the Committee, Ortiz wrote a memorandum to Mayor Koch detailing events leading up to Dr. Piesco's appearance before the Committee. Ortiz enumerated factors that were considered in setting the passing grade for examination no. 4061: (1) insuring the quality of police officers; (2) providing the Police Department, over the life of the eligible list, with a sufficient number of candidates to fulfill its hiring needs; (3) recognition that the test was only the first of several screening devices in the process of recruiting and

training police officers, i.e., all candidates who passed the test also would have to pass the rigorous curriculum at the Police Academy and the Department's 18–month probationary period, as well as psychological, character, physical and medical screening; and (4) the mandate of Title VII, 42 U.S.C. § 2000e, *et seq.* (1988), to minimize disparate impact on minority candidates. Ortiz explained to the mayor that the difference between the passing score advocated by Dr. Piesco and that ultimately established is "six items out of a 140 question test". In a misleading characterization of Dr. Piesco's testimony before the Committee, Ortiz stated that "to call any successful candidate a 'moron' or a 'functional illiterate', is irresponsible because it is without basis in fact".

On July 13, 1985, just two days after Dr. Piesco's testimony, the *New York Post* carried an article quoting Ortiz as stating that "I believe her statement is irresponsible. Whether that merits any action at this point—I haven't addressed the issue." The *New York Post* reported that Ortiz "hinted [that] he may fire [Dr. Piesco]." Dr. Piesco refused the request of the *New York Post* to respond to Ortiz' statements.

On July 31, 1985, a meeting was held at DOP concerning examination no. 4061. Dr. Piesco, Ortiz, LaPorte, DOP's General Counsel Arthur Friedman, and its Deputy General Counsel Michael Rabin attended this meeting. On August 2, 1985, Ortiz in an intradepartmental memorandum reprimanded Dr. Piesco for her actions at this meeting. The memorandum reflected that during the course of the meeting Ortiz asked Dr. Piesco why she had not reviewed the test before it was administered. Dr. Piesco responded by standing up, pointing her finger at Ortiz in an aggressive manner and yelling, "you don't know a fucking thing about testing. I am fed up with your bullshit and inaptitude." Ortiz then asked appellant to calm down and conduct herself in a civil manner, to which she replied, "I don't have to do a fucking thing, why don't you fire me?".

On August 13, 1985, appellant received two performance evaluations from La-

Porte. For the period July 1, 1983 through June 30, 1984, appellant received a "very good" overall rating. For the period July 1, 1984 through June 30, 1985, she received a "marginal" overall rating. These evaluations were in marked contrast to earlier evaluations and statements from her superiors. For the period 1982–83, Dr. Piesco received an overall evaluation of "outstanding". In a memorandum to Dr. Piesco dated March 21, 1983, Ortiz congratulated Dr. Piesco on her "outstanding performance". He noted that Dr. Piesco was one of a small number of DOP managers who received a 10 percent salary adjustment and was "indeed an asset to the agency". In a letter dated July 15, 1983, Ortiz authorized another salary increase for Dr. Piesco "[i]n recognition of [her] tireless efforts towards excellence and [her] professional dedication". After receiving the evaluations of August 13, 1985, Dr. Piesco claimed that Ortiz and LaPorte had retaliated against her for making statements to the Committee. Specifically, Dr. Piesco asserted various acts of retaliation: (1) she received two performance evaluations which improperly criticized her professional conduct; (2) a letter was placed in her personnel file criticizing her behavior at the July 31, 1985 meeting; and (3) she was excluded from two meetings with Commissioners from other agencies.

Sometime thereafter, the New York City Department of Investigation (DOI) conducted a probe of Dr. Piesco's allegations. On December 5, 1985, prior to the firing of Dr. Piesco, DOI concluded that the 1983–85 performance evaluations were improperly prepared to highlight criticism of her conduct. Ortiz and LaPorte had changed key responsibilities and performance expectations in violation of DOP's handbook, *Guidelines for Evaluating Managerial Performance in New York City*. DOI found that "[t]his treatment resulted, in part, from her testimony at the Goodman hearing". It recommended that Dr. Piesco receive new performance evaluations. DOI also found that there was no retaliatory motive for excluding Dr. Piesco from certain meetings and there was insufficient proof that placing the letter of reprimand in Dr. Piesco's personnel file was a retaliatory act.

In early December 1985, NBC contacted DOP requesting that Dr. Piesco speak to NBC on the subject of examinations in general. On December 9, 1985, Ortiz informed Dr. Piesco that she could not speak to NBC. Instead, Ortiz chose another DOP representative to be interviewed.

On December 19, 1985, Dr. Piesco commenced the instant action pursuant to 42 U.S.C. § 1983, alleging that DOP, Ortiz and LaPorte violated her first, fourth, fifth and fourteenth amendment rights. With reference to her first amendment claim, Dr. Piesco alleged that Ortiz and LaPorte retaliated against her for testifying before the Committee. She also alleged various state law claims. Eight days later, on December 27, 1985, appellant was terminated from her position at DOP.

Subsequent to DOI's investigation, Senator Goodman's Committee launched a probe of Dr. Piesco's firing. On June 24, 1986, the Committee published a report on the firing of Dr. Piesco which concluded that she was discharged "in significant measure because of her testimony before the Committee and the wide attention it received in the media." The Committee further stated that "[f]ollowing Dr. Piesco's testimony before the Committee, Mr. Ortiz evidently set about to build a retroactive case against her to justify her dismissal." Commenting on the ramifications of Dr. Piesco's firing, the Committee found that "the way in which this matter was handled by the city could have a chilling effect on future testimony about the operations of government." The report also indicated that shortly after Dr. Piesco's testimony, Senator Goodman took certain steps to prevent retaliation against Dr. Piesco: "First, he telephoned Deputy Mayor Stanley Breznoff in July 1985 ... to ask him to use his good offices to prevent retaliation against Piesco. Second, Goodman on three occasions urged the City's Corporation Counsel, Frederick A.O. Schwartz, Jr., to seek the cooperation of City Hall in finding some suitable position for Dr. Piesco."

In June 1987, Dr. Piesco filed an amended complaint which added a count for wrongful discharge. She also amended her original complaint to include Mayor Koch as a defendant. (By stipulation dated July 17, 1990, Dr. Piesco discontinued her action against Mayor Koch.)

On March 30, 1990, defendants filed a motion for summary judgment seeking dismissal of all of Dr. Piesco's claims. The motion initially came before Judge Edelstein. In an order dated May 18, 1990, he concluded that, because "there are material issues of fact, defendants' motion for summary judgment is denied."

The case subsequently was reassigned to Judge Martin. On August 14, 1990, the court granted defendants' motion for reconsideration of their summary judgment motion. Thereafter, in an opinion dated December 18, 1990, the district court granted defendants' motion for summary judgment and dismissed the complaint. The court held that, under the balancing test articulated in *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968), the City's interest, as an employer, in promoting the efficiency of the public services it performs outweighed plaintiff's interest, as a citizen, in speaking out on matters of public concern before a Senate Committee. Accordingly, it dismissed appellant's first amendment claim.

As an alternate ground for dismissing the first amendment claim, the court found that appellant's outburst of expletives at the meeting of July 31, 1985, certainly tipped the *Pickering* balance toward defendants. The court also concluded that, even if it had not held that the *Pickering* balance tipped in favor of the defendants, qualified immunity protected defendants Ortiz and LaPorte from suit.

The pendent state law claims and remaining constitutional claims also were dismissed. Dr. Piesco does not press specific challenges on appeal to the dismissal of those claims. We therefore affirm their dismissal.

On appeal, appellant chiefly contends that the district court erred in dismissing her first amendment claim. She contends that the *Pickering* balance should tip in her favor since her statements were made under oath in the context of a legislative hearing. She also contends that statements made subsequent to her testimony raise questions of fact which cannot be decided on a summary judgment motion. As a subordinate issue, she contends that qualified immunity does not insulate Ortiz and LaPorte from suit.

## II.

On an appeal from a summary judgment, we review the record de novo to determine whether any genuine issue of material fact remained for trial and whether the substantive law had been applied correctly. *Inland Cities Exp., Inc. v. Diamond Nat'l Corp.*, 524 F.2d 753, 754 (9 Cir.1975). We assess the record in the light most favorable to the party opposing summary judgment and draw all reasonable inferences in her favor. *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2 Cir.1989). "[T]he party who defended against the motion for summary judgment ... will have his allegations taken as true, and will receive the benefit of the doubt when his assertions conflict with those of the movant." 10 Wright, Miller & Kane, Federal Practice and Procedure § 2716 (1983) (footnote omitted); *see also United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Ambook Enter. v. Time Inc.*, 612 F.2d 604, 611 & n. 8 (2 Cir.1979), *cert. dismissed*, 448 U.S. 914 (1980).

## III.

### (A)

We turn first to Dr. Piesco's contention that the district court erred in granting summary judgment in favor of the City on her first amendment claim. She contends that the court erred in not according significant weight to her interest in truthfully testifying before the Committee under the *Pickering* balancing test. We agree.

In considering this contention, we need decide only whether, as a matter of law, Dr. Piesco's first amendment interest

in testifying before the Committee outweighed the City's countervailing interest, as an employer, in promoting the efficiency of the services it performs. Such determinations are questions of law. *Connick v. Myers*, 461 U.S. 138, 148 n. 7 (1983). Since this is an appeal from a summary judgment, we take as true Dr. Piesco's allegation that the City's retaliatory actions were precipitated by her testimony before the Committee. We therefore do not address whether her subsequent actions, including use of expletives at a DOP meeting, constituted an independent basis sufficient to justify the City's actions. We agree with other courts which have held that "summary judgment is inappropriate when 'questions of motive predominate in the inquiry about how big a role the protected behavior played in' the employment decision." *Peacock v. Duval*, 694 F.2d 644, 646 (9 Cir.1982) (quoting *Mabey v. Reagan*, 537 F.2d 1036, 1045 (9 Cir.1976)); *accord Eichman v. Indiana State Univ. Bd. of Trustees*, 597 F.2d 1104, 1108–09 (7 Cir.1979); *Wilderman v. Nelson*, 467 F.2d 1173, 1176–77 (8 Cir.1972). "Without a searching inquiry into these motives, those intent on punishing the exercise of constitutional rights could easily mask their behavior behind a complex web of *post hoc* rationalizations." *Peacock, supra*, 694 F.2d at 646.

Likewise, we decline to decide whether Dr. Piesco honestly believed that it was possible for a functional illiterate to pass the police examination at the level established by the City. Reviewing Dr. Piesco's affidavit opposing summary judgment and her brief on appeal, it is apparent, even at this juncture, that she believes in the veracity of her testimony before the Committee. Moreover, unlike the district court, we do not summarily discount the significance between the passing score advocated by Dr. Piesco, 89, and the score set by DOP, 85. Although it is true that the difference between the two scores would mean only that a successful candidate would have to answer six additional questions correctly, a study of the record reveals that eighteen percent of those who took the test failed to do so. Since such a significant percentage failed to answer those additional questions correctly, we fail to see how that statistic clearly undermines the veracity of Dr. Piesco's testimony. In any event, whether a functional illiterate could pass the police examination presents a material factual question which is disputed by the parties. Summary judgment is an inappropriate vehicle to resolve such factual issues.

### (B)

It is well settled that persons do not relinquish their first amendment rights to comment on matters of public interest by becoming government employees. *Rankin v. McPherson*, 483 U.S. 378, 383–84 (1987); *Connick, supra*, 461 U.S. at 140; *Pickering, supra*, 391 U.S. at 568. It also has been recognized that the government has a legitimate interest in regulating the speech of its employees that differs significantly from its interest in regulating the speech of people in general. *Id.* In *Pickering*, the Supreme Court attempted to strike a balance between these interests, in holding that the scope of a public employee's first amendment rights must be determined by balancing the public employee's rights "as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.*

"The threshold question in applying this balancing test is whether [a public employee's] speech may be 'fairly characterized as constituting speech on a matter of public concern.'" *Rankin, supra*, 483 U.S. at 384 (quoting *Connick, supra*, 461 U.S. at 146). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick, supra*, 461 U.S. at 147–48. When it has been determined that a statement touches upon a matter of public concern, we then balance the often competing interests of employer and employee. The statement at issue will "not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Rankin, supra*,

483 U.S. at 388; *Connick, supra,* 461 U.S. at 152–53. Other relevant considerations include "whether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin, supra,* 483 U.S. at 388.

Applying the *Pickering* balancing test to the instant case, the district court concluded that as a matter of law "the City's interest, as an employer, in promoting the efficiency of the public services it performs outweighed [Dr. Piesco's] interest, as a citizen, in speaking out on matters of public conern." In reaching this conclusion, the court first acknowledged that Dr. Piesco's statements to the Committee "were clearly of public concern". While recognizing that Dr. Piesco was required to testify truthfully before the Committee and that she had a right to express her views on the appropriateness of selecting a passing grade of 85 for the police examination, the court attached considerable significance to the fact that Dr. Piesco's comments were made "in the emotionally charged atmosphere of public debate on the minority hiring policies of the New York City Police Department." The court cited *Guardians Ass'n of New York City Police Dep't v. Civil Service Comm'n of New York,* 633 F.2d 232 (2 Cir.1980), *aff'd,* 463 U.S. 582 (1983), *cert. denied,* 463 U.S. 1228 (1983), which held that a previous written test used by the City to screen applicants for the position of police officer was not job related and had a disparate impact on minority members. Relying on that case, the court concluded that "the appropriateness of an 85% passing mark was one of important concern to the senior members of the City's administration, including the leaders of the Police Department and [Dr. Piesco's] superiors in the Department of Personnel."

Since Dr. Piesco was aware that selecting a passing grade of 85 minimized the disparate impact of examination no. 4061 and that the established passing grade was of significant concern to the leaders of the

Police Department and her own superiors at DOP, the court found that she "had the obligation to insure that her comments accurately reflected legitimate concerns, did not exacerbate unnecessarily a sensitive public issue and did not unfairly undermine the judgment made by her superiors and the senior officials of the Police Department." Having attached those constraints on Dr. Piesco's right to comment on matters of public concern, it was not difficult for the court to conclude that Dr. Piesco's statements in private and public meetings with the Committee were "inappropriate and irresponsible". The court suggested that the appropriate course was for Dr. Piesco to "amplify[ ] her testimony to indicate how extremely remote that possibility was." Concluding that the City was justified in terminating Dr. Piesco, the court granted summary judgment in favor of the defendants on the first amendment claim.

■ In reviewing Dr. Piesco's claims of error, " 'we are compelled to examine for ourselves the statements in issue and the circumstances under which they [are] made to see whether or not they ... are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect.' " *Connick, supra,* 461 U.S. at 150 n. 10 (quoting *Pennekamp v. Florida,* 328 U.S. 331, 335 (1946)). The Supreme Court has recognized that one of the critical purposes of the first amendment is to provide society with a basis to make informed decisions about the government. *Garrison v. Louisiana,* 379 U.S. 64, 74–75 (1964).

> "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, *the manner in which government is operated or should be operated,* and all such matters relating to political processes."

*Mills v. Alabama,* 384 U.S. 214, 218–19 (1966) (emphasis added). Indeed, the first

amendment guarantees that debate on public issues is " 'uninhibited, robust, and wide open' ". *Bond v. Floyd,* 385 U.S. 116, 136 (1966) (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 270 (1964)). "In short, speech on matters of public concern is that speech which lies 'at the heart of the First Amendment's protection' ". *Rankin, supra,* 483 U.S. at 395 (Scalia, J., dissenting) (quoting *First Nat'l Bank v. Bellotti,* 435 U.S. 765, 776 (1978)).

Here, Dr. Piesco's statements addressed the employment policies of the New York City Police Department. Specifically, her testimony enlightened members of the state legislature, and indeed the public, on the level of education and intellectual capacity required to satisfy the threshold requirement for becoming a police officer. The implications of her testimony are far reaching in light of the tremendous powers vested in police officers. Since the police officer represents the most basic unit of government, one which arguably most affects the day-to-day lives of the citizenry, Dr. Piesco's testimony concerning the competency required to become a police officer clearly is a matter of public concern. Based on the nature of her testimony, it also is apparent that this case can be readily distinguished from those cases where a disgruntled employee voluntarily comments on an employment-related matter out of a personal interest. *E.g., Connick, supra,* 461 U.S. at 148; *Barkoo v. Melby,* 901 F.2d 613, 618–20 (7 Cir.1990); *McEvoy v. Shoemaker,* 882 F.2d 463, 466–67 (10 Cir.1989).

■ Having found that Dr. Piesco's testimony addressed matters of public concern, we also find that it should be accorded significant weight in the *Pickering* balance. This conclusion is buttressed by our prior decisions. We recently held that allegations of fraud, theft, and misallocation of public funds made to the FBI were matters of serious concern and as such were entitled to "greater weight" in the *Pickering* balance. *Vasbinder v. Ambach,* 926 F.2d 1333, 1339–40 (2 Cir.1991); *see also Rookard v. Health & Hosps. Corp.,* 710 F.2d 41, 46 (2 Cir.1983) (complaint of fraudulent and corrupt practices carries great weight). At

the minimum, we consider Dr. Piesco's statements before the Committee to carry the same weight in the *Pickering* balance as allegations of unlawful conduct. Speech critical of the government is precisely the kind of speech the first amendment was designed to protect. Contrary to appellees' contention, we conclude that Dr. Piesco's testimony substantially involved matters of public concern and was entitled to great weight in the *Pickering* balancing test.

Although the district court acknowledged that Dr. Piesco's testimony was "clearly of public concern", there is no indication that it accorded significant weight to her interest in testifying before the Committee in its balancing of interests. Instead, it attached considerable significance to the nature of Dr. Piesco's comments and her senior position at DOP. We agree that these are relevant considerations in the *Pickering* balance. On the facts of the instant case, however, we reject the contention that these factors outweigh Dr. Piesco's interest in testifying truthfully before a legislative committee. We find that the burden of caution a high ranking official such as Dr. Piesco normally bears when commenting on organizational matters is mitigated by the necessity for candor in the legislative forum. We are aware of only one case that acknowledges the exceptional significance of a government employee's interest in testifying truthfully before a legislative committee.

In *Patteson v. Johnson,* 721 F.2d 228, 231–33 (8 Cir.1983), a case factually analogous to the instant one, the court recognized the plaintiff's interest in testifying about pending legislation before a legislative committee and in responding to questions posed by state senators. Concluding that testimony before a legislative committee touched upon issues of significant public concern, the court directed that "special attention" be given to the nature of plaintiff's speech on remand. *Id.* at 232–33. The court articulated the proper balancing of interests when a public employee testifies before a legislative committee: "the disruptive effect of [plaintiff's] legislative testimony upon the employment relationship [should be weighed] against [plain-

tiff's] right to testify upon pending legislation, his obligation to respond truthfully to legislative questioning, the public interest relating to the matter in controversy, and whether or not it was essential that [plaintiff] speak out ... without fear of retaliatory dismissal." *Id.* at 233. Applying these factors on remand, the district court concluded that the plaintiff's interest in testifying before the legislative committee outweighed the state's countervailing interest. *Patteson v. Johnson,* 787 F.2d 1245, 1248 (8 Cir.) (discussing district court's opinion with approval), *cert. denied,* 479 U.S. 828 (1986). The district court reasoned that " '[a]s a citizen ... [plaintiff] had a legitimate and substantial interest in speaking his support for the proposed legislation and to speak truthfully in direct response to questions....' " *Id.* (quoting district court's memorandum decision). The district court added that plaintiff's testimony was "a matter of *substantial* public concern." *Id.* (emphasis added).

On the peculiar facts of the instant case, we conclude that Dr. Piesco's right to give truthful answers before the Committee takes precedence over the City's interest in efficiently performing government services. While not subpoenaed to testify, it was apparent that Dr. Piesco would have been compelled to appear had she declined the Committee's invitation. Dr. Piesco's comments were made while under oath before a legislative committee. She responded to a direct question by Senator Goodman in the manner contemplated. Her testimony related to matters of significant public interest and, in view of her senior position at DOP's Bureau of Examinations, she was uniquely qualified to comment on the police examination. Dr. Piesco was not simply a test scorer or proctor charged with the responsibility for monitoring the exams; her duties were much more comprehensive. She had expertise in the area of examinations. It is for this reason that the Committee sought her testimony. Finally, Dr. Piesco's superior, Juan Ortiz, sat next to her during her testimony, and there is no indication in the record that he counseled her to elaborate on her testimony.

While we acknowledge that Dr. Piesco's statements to the Committee tangentially touched on the sensitive area of minority recruitment, we do not read the first amendment as requiring one to shade her testimony before a legislative committee so as not to "exacerbate" a sensitive public issue. When responding to a question under oath, absent some valid privilege, a person has one obligation under law—to answer honestly. N.Y. Penal Law § 210.00–.50 (McKinney 1988).

The need for honest and candid testimony takes on added significance when one appears before a legislative committee conducting an investigation. The Supreme Court has recognized that "the power of inquiry—with the process to enforce it—is an essential and appropriate auxiliary to the legislative function". *McGrain v. Daugherty,* 273 U.S. 135, 174 (1927). "A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information—which not infrequently is true—recourse must be had to others who do possess it." *Id.* at 175. Although the Court was referring to the investigative powers of Congress, it cited with approval various state authorities which stand for the proposition that state legislatures possess identical investigative authority. *Id.* at 165–67; *see also Keeler v. McDonald,* 99 N.Y. 463, 482–83 (1885) (provision authorizing state legislative committees to take testimony and summon witnesses may be "indispensable to intelligent and effectual legislation"). Indeed, the power to secure needed information by investigation "has long been treated as an attribute of the power to legislate", predating the enactment of the Constitution in both England and the United States. *Id.* at 161. Recognizing the importance of an enlightened legislature to our system of government, one commentator reached the inevitable conclusion that "[p]ublic policy requires that the [state legislature's investigative] power be broad because of the need for informed legislative decisions." Vitiello, *The Power of State*

*Legislatures to Subpoena Federal Officials*, 58 Tul.L.Rev. 548, 551 (1983). Requiring less than candor and honesty from witnesses witnesses appearing before legislative committees would undermine our system of government which is predicated on an informed and enlightened legislature. We decline to read into the first amendment a restriction which requires a person to temper testimony before a legislative committee so as not to "exacerbate" a sensitive issue.

We hold that the district court erred in failing to accord significant weight both to the inherent first amendment value of Dr. Piesco's testimony and to the forum in which it was elicited.

### (C)

■■■ Having concluded that Dr. Piesco's testimony was entitled to great weight in the *Pickering* balancing test, we turn next to the question of whether her statements undermined the efficiency of the services performed by DOP. In reviewing the harm caused by Dr. Piesco's statements, we are mindful that the burden is on the public employer to show that its interest in promoting the efficient performance of services outweighs the employee's speech interest. *Rankin, supra*, 483 U.S. at 388; *Vasbinder, supra*, 926 F.2d at 1339. The "burden in justifying a particular discharge varies depending upon the nature of the employee's expression." *Connick, supra*, 461 U.S. at 150.

In *Connick*, an assistant district attorney circulated a questionnaire in the office soliciting views of her fellow staff members on such topics as office policies, morale, level of confidence in superiors, and whether employees felt pressured to work in political campaigns. The Court first concluded that the questionnaire addressed only matters of limited public concern. *Id.* at 148–49. In addressing the government's burden of demonstrating that the employee's statements undermined office relationships, the Court held that it was unnecessary for an employer "to allow events to unfold to the extent that the disruption of the office and the destruction of working

relationships is manifest before taking action". *Id.* at 152. It therefore held that the District Attorney and his first assistant's unsupported claims, that the questionnaire interfered with working relationships, was sufficient to carry the government's burden of proof. *Id.* at 151–52. The Court emphasized, however, that where the employee's speech more substantially involved matters of public concern, a stronger showing by the government is required. *Id.* at 152. Consistent with that caveat, the Court held in a subsequent case that an employee's first amendment rights must prevail in the balancing of interests where there is no evidence that the employee's statements interfered with the efficient functioning of the office. *Rankin, supra*, 483 U.S. at 388–89; *see also id.* at 393 n. * (Powell, J., concurring) ("[i]n this case, however, there is no objective evidence that [plaintiff's] lone comment had any negative effect on morale or efficiency of the Constable's office"); *American Postal Workers Union v. United States Postal Serv.*, 830 F.2d 294, 303–04 & n. 12 (D.C.Cir.1987) (official's opinion that speech interfered with efficient operation is insufficient to outweigh an employee's interest in speaking on a matter of public concern). *Cf. Tinker v. Des Moines Indep. School Dist.*, 393 U.S. 503, 508 (1969) ("in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression").

■■■ Where, as in the instant case, the employee's speech substantially involved matters of public concern, the government is required to make a stronger showing of interference with operations. *Connick, supra*, 461 U.S. at 152. Examining the record before us, we cannot conclude that Dr. Piesco's statements to the Committee undermined the effective and efficient operation of DOP. The record is devoid of any facts which demonstrate that Dr. Piesco's testimony either interfered with DOP's efficient functioning or impeded the proper performance of her daily duties. Neither Ortiz nor LaPorte has submitted affidavits explaining how their working relationship with Dr. Piesco was affected by her testi-

mony or how the operations of DOP were disrupted. Moreover, unlike appellees, we do not interpret Dr. Piesco's exclusion from meetings as demonstrating that work relationships were disrupted at DOP. Construing the facts most favorably to Dr. Piesco, her exclusion could be considered a further act of retaliation. Consistent with *Connick* and its progeny, we decline the government's invitation to presume that Dr. Piesco's speech was harmful to DOP's efficient functioning. Where the statements involved so clearly touch on matters of public concern, the government is required to demonstrate interference with the efficient functioning of the workplace. *Id.* We hold that the City has failed to carry its burden of proving harm to the efficient functioning of DOP.

As a final matter, we appreciate the potential ramifications of holding Dr. Piesco's testimony unprotected by the first amendment, as did the district court. A government employee called to testify before a legislative committee about work-related matters would be confronted with a Hobson's choice. She could either (1) honestly answer the question, in which case, as a matter of law, she could be fired; (2) commit perjury; or (3) refuse to answer the question posed and be held in contempt, *see* N.Y. Penal Law § 215.60(3) (McKinney 1988); *Lanza v. New York*, 370 U.S. 139 (1962) (upholding conviction for refusing to answer questions before a New York State legislative committee), *overruled on other grounds, Katz v. United States*, 389 U.S. 347 (1967). By offering a government employee the option of jail or unemployment, we would put our imprimatur on chilling speech in a forum where candor is critical to informed decision-making. This we decline to do. We consider it essential that a person in Dr. Piesco's circumstance be able to testify before a legislative committee without fear of retaliation.

In light of both appellees' failure to demonstrate that Dr. Piesco's statements caused any harm to DOP or to intra-office work relationships and the court's failure to accord significant weight to Dr. Piesco's testimony before the Committee, we hold that the district court improperly balanced the *Pickering* factors. On this record, it was inappropriate to grant summary judgment in favor of appellees.

IV.

This brings us to the district court's holding that Ortiz and LaPorte are insulated from suit by the doctrine of qualified immunity.

The qualified immunity doctrine shields government officials performing discretionary functions from liability for civil damages insofar as their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Even where the rights were clearly established, officials are immune if it was objectively reasonable for them to believe that their acts did not violate those rights. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). An official does not have immunity, however, where the contours of the right were sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Id.* at 640. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* (citation omitted).

To determine whether it was objectively reasonable to conclude that retaliation was appropriate "will often require examination of information possessed" by the retaliating official. *Id.* at 641. The question we must answer therefore is whether a reasonable official would have believed that retaliation was lawful in light of clearly established law and information available to the retaliating official. *Id.* We reiterate that "[i]n the context of a summary judgment motion, we also must view the record most favorably to [Dr. Piesco], as the party opposing the motion, and 'accept [her] account of the reasons for [her] dismissal.'" *Giacalone v. Abrams*, 850 F.2d 79, 85 (2 Cir.1988) (quoting *Hawkins v. Steingut*, 829 F.2d 317, 319 (2 Cir.

1987) (citation omitted)). As stated above, for the purposes of this appeal, it is assumed that Ortiz and LaPorte retaliated against Dr. Piesco because of her testimony before the Committee.

In light of the clear public interest value of Dr. Piesco's speech and the apparent lack of disruption at DOP, we conclude that the court erred in holding that Ortiz and LaPorte were immune. We consider this case much like others which have addressed an official's claim of qualified immunity where it was apparent that the individual retaliated against was exercising his first amendment rights. In *Reuber v. Food Chemical News, Inc.*, 899 F.2d 271, 287–88 (4 Cir.1990), *rev'd on other grounds*, 925 F.2d 703 (4 Cir.1991) (en banc), the court held that the plaintiff's remarks which were critical of the government go "to the heart of the interests protected by the First Amendment, and the defendants could not have reasonably believed that they were acting within their rights". *Id.* Similarly, in *Dobosz v. Walsh*, 892 F.2d 1135, 1141 (2 Cir.1989), we held that a police officer "clearly was exercising his right to free speech" when he cooperated with the F.B.I. and testified in court against a fellow officer. "Because the proscription of retaliation for a plaintiff's exercise of First Amendment rights has long been established, . . . we conclude[d] that [the superintendent of the police department was] not entitled to qualified immunity. . . ." *Id.* at 1141–42.

Here, as in *Reuber* and *Dobosz*, we consider Dr. Piesco's statements of such clear public concern that it would not be reasonable for Ortiz and LaPorte to conclude that it was lawful to discharge or otherwise retaliate against Dr. Piesco. The claim of qualified immunity is further undercut by appellees' failure to present any evidence of harm resulting from Dr. Piesco's testimony. Moreover, the DOI report which was released approximately three weeks prior to Dr. Piesco's dismissal put Ortiz and LaPorte on notice that their improperly prepared evaluation of Dr. Piesco was retaliatory in nature. In light of the DOI report, it is incomprehensible how Ortiz and LaPorte reasonably could have considered their subsequent discharge of Dr. Piesco to be lawful.

We hold on the record before us that it was improper to conclude that Ortiz and LaPorte were immune.

## V.

To summarize:

We hold that the district court erred in granting summary judgment in favor of appellees. First, the court improperly applied the *Pickering* balancing test. Although Dr. Piesco testified concerning matters of great public concern in a forum where candor is critical, the court failed to attach significant weight to Dr. Piesco's testimony in the *Pickering* balancing test. Moreover, in light of the significant first amendment value of Dr. Piesco's speech, the court failed to hold the government to its standard of proving interference with DOP's efficient operations.

We further hold that the court erred in concluding that Ortiz and LaPorte were immune from suit. Since Dr. Piesco's testimony was of significant public concern and there was no evidence of disruption at DOP as a result of her comments, it was not reasonable for Ortiz and LaPorte to believe that their actions were lawful.

The judgment of the district court is reversed insofar as it dismissed Dr. Piesco's first amendment claim. We remand that claim for further proceedings not inconsistent with this opinion. We affirm the dismissal of the pendent state law claims and the constitutional claims other than the first amendment claim.

Reversed and remanded in part; affirmed in part.