17-3449-pr
Lewis v. Swicki

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2019

Argued: October 22, 2019                    Decided: December 6, 2019

Docket No. 17-3449

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CHRISTOPHER J.M. LEWIS,

        Plaintiff - Appellant,

           v.

BRIAN SIWICKI, DAVID BUTKIEWICUS,

        Defendants - Appellees.[1]

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Before: KATZMANN, *Chief Judge*, and NEWMAN, PARK, *Circuit Judges*.

Appeal from a judgment of the District Court for the District of Connecticut dismissing, on motion for summary judgment, an Eighth Amendment claim by a state prisoner that state corrections officers were deliberately indifferent to a substantial risk of harm, which resulted in an assault to the prisoner by another prisoner.

---

[1] The Clerk is requested to amend the official caption as above.

Reversed and remanded.

Judge Park dissents in a separate opinion.

Rosendo Garza, Jr. (Daniel E. Wenner, on the brief), Day Pitney LLP, Hartford, CT, for Plaintiff - Appellant Christopher J.M. Lewis.

James W. Caley, Asst. Atty. General (George Jepsen, Atty. General, on the brief), Connecticut Office of the Attorney General, Hartford, CT, for Defendants - Appellees Siwicki and Butkiewicus.

JON O. NEWMAN, Circuit Judge:

The principal issue on this appeal is whether state prison officials were entitled to summary judgment on an Eighth Amendment claim by a state prisoner that they were deliberately indifferent to a substantial risk of serious harm. Christopher J.M. Lewis appeals from the Sept. 28, 2017, judgment of the District Court for the District of Connecticut (Dominic J. Squatrito, District Judge) dismissing his second amended complaint against Lt. Brian Siwicki[2] and Capt. David Butkiewicus (collectively, "Defendants" or "Appellees"), formerly prison

---

[2] In some documents in this litigation, the name is spelled "Swicki," but the Appellees' brief and Siwicki's affidavit spell it 'Siwicki."

officials of the Connecticut Department of Correction ("DOC"). Lewis suffered serious injuries when he was assaulted by another prisoner.

We conclude that the District Court incorrectly stated the summary judgment standard applicable to Lewis's claim and that factual issues precluded entry of summary judgment for Siwicki and Butkiewicus. We therefore reverse the grant of summary judgment and remand for further proceedings.

Background

At all relevant times, Lewis was a prisoner at Northern Correctional Institution ("NCI"), a prison operated by DOC. Lewis was a member of a gang of prisoners at NCI, known as PIRU or PIRU Bloods. As described by the District Court in other litigation, NCI is "a maximum level security institution. Housing inmates on death row, gang threat program inmates, inmates with chronic discipline, and inmates who have demonstrated a serious inability to adjust to confinement, posing a threat to the safety and security of the community, staff, and other inmates." *Taylor v. Murphy*, No. 3:10-cv-245 (HBF), 2012 WL 4512510, at *1 (D. Conn. Sept. 30, 2012). Siwicki and Butkiewicus both worked at NCI. Siwicki was a lieutenant, serving as intelligence supervisor, and Butkiewicus was a captain.

Lewis was assigned to the Security Risk Group Threat Member ("SRGTM") program. The SRGTM program at NCI was designed for inmates who have been "designated by DOC as gang members and threats to the general prison population." *Id*. On Nov. 25, 2010, Lewis was housed in unit 2E-212, an area designated as "Security Risk Group-Phase 1." All prisoners at NCI are confined to their cells except for one hour of recreation in the prison's yard, or brief intervals for medical issues, visitation, and phone calls. All prisoners in Phase 1 are both strip-searched and handcuffed with their hands behind their backs when they go to the recreation yard. We were informed at oral argument that NCI has a small yard suitable for recreation by a single prisoner.

In July 2010, according to Siwicki's affidavit, he intercepted a written communication about an episode in which Lewis "was described as having disagreed with 'PIRU Bloods' rules and had been accused of breaking them."[3] Siwicki also averred that an inmate named Christian Mulligan, the leader of the PIRU group at NCI, "was reported to have decided that Inmate Lewis 'was done.'" In August or September 2010, according to Lewis's deposition, he had a meeting with Siwicki, who told him that there was "information that an assault was going to

---

[3] Lewis said in his deposition that his "affiliation . . . is Piru, not Blood." J. App'x 58.

be against [him]." J. App'x 66. Later in September, Lewis met with Siwicki and Butkiewicus. They told Lewis that they were aware of the July episode and that his safety could be in "jeopardy," *id*. at 68, specifically, that a member of PIRU was "going to attack" him, *id*. at 72.

On November 25, 2010, Nicholas Trabakoulos, a NCI prisoner and member of PIRU, attacked Lewis in the recreation yard with a four-inch piece of metal, inflicting serious wounds to his face and neck. Although handcuffed entering the prison yard, Trabakoulos was able to slip one of his hands out of the handcuffs.

After the attack, Siwicki conducted an investigation. In his report, he "concluded that the assault on inmate Lewis was a result of a standing order issued by inmate Mulligan prior to his transfer out of state." *Id.* at 86. Siwicki's report stated, based on an interview with another inmate, Kareen Mayo, that Mulligan "did place a hit on inmate Lewis . . . for his disrespect and violation of blood rules." *Id.* at 85.

In April 2013, Lewis filed a pro se complaint under 42 U.S.C. § 1983 against Siwicki and Butkiewicus,[4] alleging that they violated his Eighth Amendment rights by failing to protect him from Trabakoulos's attack after learning of a threatened

---

[4] The Complaint also named the corrections officer who searched Trabakoulos after the attack. The second amended complaint did not renew a claim against that officer.

"future assault." Id. at 5, ¶ 2. Defendants moved to dismiss, arguing that the attack occurred approximately four months after the alleged threat. The District Court granted Defendants' motion to dismiss in October 2013. *Lewis v. S[i]wicki*, No. 3:13-cv-00495, slip op. at 5 (D. Conn. Oct. 28, 2013) ("*Lewis I"*). The Court stated, "Nothing happened for nearly six months," *id*. at 4, although in fact the September attack occurred four months after Siwicki learned of the threat in July.

In October 2015, this Court vacated the dismissal of the claims against Siwicki and Butkiewicus and directed the District Court to grant Lewis leave to amend his complaint. *Lewis v. S[i]wicki*, 629 F. App'x 77, 80–81 (2d Cir. 2015) ("*Lewis II*"). We said that "we are not persuaded that the fact that Lewis was not attacked for several months after the threat was made is sufficient to defeat his deliberate indifference claim at this stage." *Id*. at 79.

In February 2016, Lewis, represented by counsel, filed a second amended complaint, adding details about Defendants' knowledge of the threatened attack, which he had learned from Siwicki's incident report.

In September 2017, the District Court granted Defendants' motion for summary judgment. *See Lewis v. S[i]wicki*, No. 3:13cv495 (DJS), 2017 WL 4286300 (D. Conn. Sept. 27, 2017) ("*Lewis III*"). The Court recognized the two requirements that

the Supreme Court established in *Farmer v. Brennan*, 511 U.S. 825 (1994), for a prisoner claiming that prison officials failed to protect him in violation of the Eighth Amendment: (1) incarceration "under conditions posing a substantial risk of serious harm" and (2) prison officials' "deliberate indifference to inmate health or safety," *id*. at 834. *See Lewis III,* 2017 WL 4286300, at *3. The Court concluded that Lewis had failed to present evidence creating "a genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), as to either substantial risk of serious harm or deliberate indifference on the part of Siwicki and Butkiewicus, and therefore granted their motion for summary judgment.

## Discussion

We review *de novo* a District Court's grant of summary judgment. *See Hayes v. New York City Dep't of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996). The summary judgment standards are well established. S*ee Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50 (1986); *Celotex v. Catrett*, 477 U.S.317, 322 (1986); *Piesco v. City of New York*, 933 F.2d 1149, 1154 (2d Cir. 1991). We need emphasize only that, in determining whether the pretrial showing of the parties permitted the District Court to conclude that there was no genuine dispute of material fact, we must view the evidence "in the light most favorable" to the party opposing summary judgment.

*See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Applying this standard, we proceed to consider whether a genuine dispute of material fact existed with respect to the two *Farmer* factors: a substantial risk of serious harm to Lewis and deliberate indifference to that risk on the part of Siwicki and Butkiewicus.

With respect to the first *Farmer* factor, substantial risk of serious harm, the District Court did not question that the harm facing Lewis was serious. There was information that an assault against him would occur because he had violated PIRU rules, and the leader of PIRU at NCI had reported that, because of such violation, Lewis "was done." The threat against Lewis was plainly not "vague," as our dissenting colleague suggests. Diss. Op. at 4. What the District Court found insufficient to present a genuine dispute of material fact was evidence that the *risk* of serious harm to Lewis was substantial. The Court offered three reasons for this conclusion.

First, the Court noted that "a prison official cannot avoid liability under the Eighth Amendment by arguing that, 'while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault.'" *Lewis III*, 2017 WL 4286300, at \*4 (quoting *Farmer*, 511 U.S. at 843). That quotation from

8

*Farmer* led the Court to conclude that "the question in this case is whether the defendants were 'aware of an obvious, substantial risk' to Lewis's safety." *Id*. (quoting *Farmer*, 511 U.S. at 843). The District Court thereby transformed the phrase, "obvious, substantial risk," which *Farmer* had used in an introductory clause to show when a prison official could *not* avoid liability, into a requirement for showing that an official *was* liable. This was error, as Appellees concede. *See* Br. for Appellees at 19.

Furthermore, the District Court's error not only required that the substantial risk of serious harm must be "obvious," the Court also erred in linking the prison officials' required *mens rea* to the first *Farmer* factor. However, their mental state is relevant to the second *Farmer* factor, deliberate indifference, which we consider below. The first *Farmer* factor, substantial risk of serious harm, depends not on the officials' perception of the risk of harm, but solely on whether the facts, or at least those genuinely in dispute on a motion for summary judgment, show that the risk of serious harm was substantial.

The District Court's second reason for rejecting the existence of a substantial risk of serious harm was that Lewis's testimony was "uncertain and ambiguous." *Lewis III*, 2017 WL 4286300, at *4. This assessment was also error. Lewis stated

unequivocally at his deposition that Siwicki had told him that there was "information that an assault was going to be against [him]." J. App'x 66, and that Siwicki and Butkiewicus had told him that his safety could be in "jeopardy," *id.* at 68, specifically, that a member of PIRU was "going to attack" him, i*d*. at 72. In addition, Siwicki's affidavit acknowledged intercepting an inmate communication before the attack in which Lewis was accused of breaking PIRU rules, as a result of which, according to an order of the leader of PIRU, Lewis "was done."[5] *Id*. at 89. There was nothing uncertain about this evidence.

The District Court's third reason for rejecting the existence of a substantial risk of serious harm was the interval between the July interception of the inmate communication and the November assault, an interval Judge Squatrito correctly measured as four months, rather than the six months measured by the judge who had dismissed Lewis's pro se complaint. Whether a risk of serious harm to a prisoner is substantial for purposes of the first *Farmer* factor is not subject to a bright line test. As is often true, the determination of what is "substantial" depends on the

---

[5] Siwicki's affidavit states that he interpreted the gang leader's statement "to mean that Inmate Mulligan had decided to terminate Lewis's membership in the PIRU Bloods." J. App'x 89. Whether or not a fact-finder would consider credible Siwicki's claimed interpretation of the gang leader's statement, if he renews it at trial, that interpretation of merely a loss of PIRU membership for Lewis is not one available to a district court at summary judgment, viewing the evidence in the light most favorable to Lewis.

context of the inquiry.[6] That is especially true where, as here, what is being assessed is itself a variable concept such as risk.

Pertinent to the context of whether the risk of serious harm to Lewis was substantial is the nature of the prison population with whom he was incarcerated. NCI is a maximum level security institution, housing prisoners "posing a threat to the safety and security of . . . other inmates." *Taylor*, 2012 WL 4512510, at *1. NCI officials consider the risk of prisoners harming other prisoners so substantial that, as noted above, they confine them to their cells except for an hour a day for recreation in the prison yard and other brief intervals for medical attention, visitation, and phone calls.

In this context, it was error for the District Court to rule that a four month interval between a reported threat of an assault on Lewis and the attack that occurred did not present at least a genuine dispute of material fact as to whether the risk of serious harm was substantial. Of course, at some point long after a prison

---

[6] See, *e.g.*, *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("[W]hatever the meaning of 'substantial' in other contexts," the threshold for determining whether substantial evidence supports an administrative agency's finding is "not high."); *Victor v. Nebraska*, 511 U.S. 1, 20 (1994) ("[I]n the context of the sentence [of a jury charge]" equating substantial doubt with reasonable doubt was not ambiguous.); *Steadman v. S.E.C.*, 450 U.S. 91, 100 (1981) (For purposes of interpreting sections 7(c) and 10(e) of the Administrative Procedures Act, "Congress intended the words 'substantial evidence' to have different meanings in context.")

official learns that a gang leader has marked a named prisoner as "done" for violating gang rules, the official would be entitled to consider the risk of harm insubstantial. But four months is not, as a matter of law, beyond that point, especially at a prison housing prisoners identified as threats to the safety of other prisoners. Although a prison gang member planning to carry out a gang leader's order to see to it that another gang member is "done" might act soon, he might also need at least a few months to obtain both a weapon and an opportunity to use it. The District Court's summary judgment for the Defendants failed to view the evidence of the threat "in the light most favorable" to the party opposing summary judgment (Lewis), as the Supreme Court requires, see *Diebold*, 369 U.S. at 655.

Our dissenting colleague contends that the record does not "reflect that defendants believed that Lewis was at risk notwithstanding the strict procedures of the SRGTM program." Diss. Op. at 4. The record is undisputed, however, that the defendants believed the risk to Lewis was serious enough to inform him that "an assault was going to be made against him," J. App'x 66, and that his safety could be in "jeopardy," *id*. 68.

With respect to the second *Farmer* factor, deliberate indifference on the part of prison officials, the District Court first recited the Supreme Court's statement that

12

"'prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability is they responded reasonably to the risk, even if the harm was not averted.'" *Lewis III*, 2017 WL 4286300, at *5 (quoting *Farmer*, 511 U.S. at 844). The Supreme Court also said in *Farmer* that prison officials may be liable "by failing to take reasonable measures to abate" a known risk of serious harm. 511 U.S. at 847.

The District Court then concluded that Lewis had failed to create a genuine dispute of material fact as to whether Defendants' failure to take action to protect Lewis was unreasonable. *See Lewis III*, 2017 WL 4286300, at *5. The Court's reason was that the procedures at NCI for inmates in the SRGTM Program "virtually preclude a finding of deliberate indifference." *Id*. The Court pointed out that all inmates were handcuffed behind their backs whenever they left their cells, were searched before they entered the recreation yard, and were observed from a window by DOC officers. *See id*. Our dissenting colleague also contends that these procedures sufficed as a matter of law to insulate the defendants from liability for failing to take reasonable steps to guard against the serious risk to Lewis of which they were indisputably aware.

13

Although these procedures might well weigh against a fact-finder's conclusion that Defendants failed to take reasonable steps to avoid harm to Lewis, their persuasive force might be overcome by Defendants' failure to place Lewis in NCI's individual yard for his hour of recreation, thereby significantly limiting the opportunity for a PIRU member to carry out the PIRU leader's order. A fact-finder might also consider that prison officials failed to take reasonable measures to protect Lewis from harm by not transferring him out of NCI. Our dissenting colleague points out that these arguably reasonable protective measures are not in the record nor mentioned in the briefs. But we are not reviewing the sufficiency of a trial record, only the correctness of a summary judgment for Defendants. The existence of an individual recreation yard at NCI was brought to our attention at oral argument and not disputed by Appellees. The availability of this protective measure and the availability of a transfer are indisputable facts of which a court may take judicial notice. *See* Fed. R. Evid. 201(b).

## Conclusion

Viewing the evidence "in the light most favorable" to Lewis, the party opposing Defendants' motion, as we are required to do, s*ee Diebold*, 369 U.S. at 655, we conclude that summary judgment for Defendants was improperly entered. The

14

judgment of the District Court is reversed, and the case is remanded for further proceedings.

MICHAEL H. PARK, *Circuit Judge*, dissenting:

The Eighth Amendment does not require prison officials to stand trial when one inmate attacks another in spite of stringent security procedures designed to prevent just this type of incident. The assault in this case occurred at Northern Correctional Institution ("NCI") in the Security Risk Group Threat Member ("SRGTM") program, a special unit in the maximum-security prison that housed inmates designated as gang members and threats to the general prison population. The record reflects no history of assaults within the SRGTM program or any other reason to question the effectiveness of its security measures, which include 23-hour daily confinement in cells, continuous observation, regular strip searches, and handcuffing inmates behind their backs whenever they are outside their cells. Under these circumstances—even assuming that Lewis was incarcerated under conditions posing a substantial risk of serious harm—Defendants reasonably relied on the special, maximum-security protocols of the SRGTM program. Because there is no indication that Defendants acted with "deliberate indifference" to Lewis's safety, I respectfully dissent.

Under the Eighth Amendment, "prison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (cleaned up). The Supreme Court has set forth two requirements for stating a violation of the Eighth Amendment. First, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id*. at 834. Second, the inmate must demonstrate that the prison official acted with "deliberate indifference to inmate health or safety." *Id*. That is, the prison official must "know[] of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837.

Because this standard is strict, "[n]ot . . . every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Id*. at 834. Even "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id*. at 844. This is because a "prison official's duty under the Eighth Amendment is to ensure 'reasonable safety,' a standard that incorporates

2

due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions.'" *Id.* at 844–45 (citations omitted).

Although the district court misstated the standard under the first *Farmer* factor, there is no genuine issue of material fact as to whether Defendants acted reasonably under the second factor. The SRGTM program was designed specifically to prevent gang violence in the prison and thus implements strict, pre-emptive measures. *See* App'x at 89 ("[I]nmates are housed under these restrictive conditions because of the potential for assaultive behavior stemming from gang affiliation."). For example, inmates in the program are observed every 15 minutes and are confined to their cells except for one hour of recreation time five days per week. When they leave their cells, inmates are handcuffed behind their backs and escorted by prison officials. They are strip-searched before they enter the recreation yard, and they remain handcuffed behind their backs while officers observe them from a window. There is no evidence in the record that these procedures were in any way inadequate to prevent assaults in the past or that Defendants deviated from them in this case. Defendants thus acted reasonably in relying on these security protocols to protect Lewis from any possible ongoing threat stemming from gang affiliation.

3

Nor does the record reflect that Defendants believed that Lewis was at risk notwithstanding the strict procedures of the SRGTM program—that is, that Defendants actually knew of and disregarded an excessive risk to Lewis's safety. Nothing in Lewis's allegations identified a need to consider additional precautions. Lewis alleged only that Siwicki learned four months before the assault that there was "information that an assault was going to be against" Lewis, that Siwicki and Butkiewicus told him that his safety could be in "jeopardy," and that a member of PIRU was "going to attack" him. App'x at 66, 68, 72. On the basis of these vague threats alone, Defendants could not have anticipated that an unidentified, potential assailant would be able to sneak a weapon into the recreation yard, maneuver his bound hands from behind his back, and then slip out of his handcuffs, all while evading detection by prison officials. *See id.* at 84 ("Inmate Trabakoulous could be viewed stepping out of view of the camera with his hand restraints secured from behind and returning in view with them in the front. He then slips out of view again and returns in view with one cuff unsecured."). Trabakoulous had to circumvent at least three different SRGTM program safeguards in order to carry out his attack on Lewis. There is no evidence that Defendants aided, facilitated, or enabled

4

Trabakoulous's attack or that they failed to adhere in any way to SRGTM program protocols.

The majority proffers that Defendants could have placed Lewis in the "individual yard for his hour of recreation," an arrangement mentioned nowhere in the record or by either party in their briefs. The majority also suggests that Lewis could have been transferred out of NCI—despite the fact that the program at NCI was specifically designed to house dangerous inmates like Lewis and Trabakoulous. But these hypothetical precautions do not demonstrate that Defendants acted unreasonably by relying on the security protocols of the SRGTM program. The majority's Monday-morning quarterbacking fails to give "due regard" to Defendants' "unenviable task of keeping dangerous men in safe custody under humane conditions." *Farmer*, 511 U.S. at 845. Respectfully, the majority overreaches by offering logistical suggestions to prison officials about alternative arrangements that it believes might have increased an inmate's safety. This approach would "transform federal judges into superintendents of prison conditions nationwide." *Id.* at 860 (Thomas, *J.* dissenting). "[T]he question in deliberate indifference cases is not whether the officials could have taken additional precautions—almost invariably, with the benefit of 20/20 hindsight,

there are additional precautions that could have been taken—but whether they disregarded an excessive risk to health or safety." *Parrish v. Cleveland*, 372 F.3d 294, 309 (4th Cir. 2004) (cleaned up). In short, the fact that Defendants could have taken additional measures to protect Lewis does not mean that they acted with deliberate indifference.

For these reasons, I would affirm the judgment of the district court.