## PHILIP H. SCHNABEL *v.* CLYDE R. TYLER
## (14853)

PETERS, C. J., CALLAHAN, BORDEN, BERDON and KATZ, Js.

Argued March 30—decision released August 9, 1994

*Scott M. Karsten,* with whom, on the brief, was *Elliot B. Spector,* for the appellant (plaintiff).

*Kathleen Eldergill,* for the appellee (defendant).

BERDON, J. The principal issue in this certified appeal is whether, in an action seeking damages for violation of federal civil rights, the chief of police was entitled to qualified immunity.

The plaintiff, Philip Schnabel, the chief of police of the town of Rocky Hill, brought suit against the defendant, Clyde Tyler, a Rocky Hill police officer, seeking damages for defamation as the result of public comments made by Tyler about Schnabel. Tyler filed a five count counterclaim against Schnabel seeking damages for false imprisonment, intentional infliction of emotional distress, abuse of process, and violations of his federal civil rights under 42 U.S.C. § 1983 (1988).[1] The

---

[1] Title 42 of the United States Code, § 1983 (1988) provides: "CIVIL ACTION FOR DEPRIVATION OF RIGHTS.

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, priv-

two § 1983 counts are predicated on claimed violations of Tyler's constitutional rights to freedom of speech under the first amendment, and equal protection of the law under the fourteenth amendment to the United States constitution. The case was tried to a jury, which returned verdicts in favor of Tyler on Schnabel's complaint and on the five counts of Tyler's counterclaim. On the counterclaim, the jury awarded Tyler compensatory damages in the amount of $210,000 and punitive damages in the amount of $160,000.[2] The trial court denied Schnabel's postverdict motions and rendered judgment on the verdicts. Schnabel appealed to the Appellate Court, which affirmed the judgment of the trial court. *Schnabel* v. *Tyler,* 32 Conn. App. 704, 630 A.2d 1361 (1993). We granted Schnabel's petition for certification.[3] We affirm the judgment of the Appellate Court.

## I

The following facts are either undisputed or could reasonably have been found by the jury. Prior to the

ileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

[2] On the false imprisonment count, the jury awarded Tyler $25,000 compensatory damages and $20,000 punitive damages. On the intentional infliction of emotional distress count, the jury awarded Tyler $100,000 compensatory damages, and $50,000 punitive damages. On the abuse of process claim, the jury awarded Tyler $35,000 compensatory damages and $50,000 punitive damages. On the § 1983 first amendment claim, the jury awarded Tyler $25,000 compensatory damages, and $20,000 punitive damages. On the § 1983 equal protection claim, the jury awarded Tyler $25,000 compensatory damages, and $20,000 punitive damages.

[3] We certified the following issues: (1) "Did the Appellate Court properly conclude that the trial court had been correct in ruling that the qualified immunity defense under 42 U.S.C. § 1983 was not available to the plaintiff?" and (2) "Did the Appellate Court properly conclude that the trial court had correctly excluded the evidence offered by the plaintiff on the issue of the plaintiff's qualified immunity under 42 U.S.C. § 1983?" *Schnabel* v. *Tyler,* 227 Conn. 932, 932–33, 632 A.2d 708 (1993).

For the resolution of the second certified issue, see footnote 17.

incidents that form the basis for this action, the Connecticut commission on human rights and opportunities had investigated the Rocky Hill police department and had issued a report concluding that racist attitudes and behavior permeated the department. Compounding this controversy, according to Schnabel, was the fact that "many . . . citizens . . . would call Rocky Hill Police to report [that individuals were suspicious] simply because they were minority and were in Rocky Hill." The report and the racial controversy placed considerable pressure on the police department.

Subsequently, in February, 1988, a Rocky Hill service station owned by Isabelle Teed was the subject of an armed robbery. A rumor spread throughout the town that a hotel clerk had suspected that an individual he had seen on the day of the robbery had committed the robbery, but the clerk had not contacted the police because the suspect was an African-American male, and the clerk was concerned about being accused of racism by the police. Tyler spoke with Teed about this particular rumor and about a general belief held by some members of the community that the police department would summarily dismiss complaints against minorities for fear that they would be again accused of racism. Teed expressed a desire to speak before the meeting of the town council about these perceptions of the police department. Tyler encouraged Teed to speak out regarding her concerns. Teed then publicly criticized Schnabel at the town council meeting.

Robert Riley, deputy chief of police, and Joseph Corbin, chief of detectives, of the Rocky Hill police department, subsequently questioned Teed, and she told them that prior to the town council meeting she had spoken with a police officer, whom she declined to identify. Schnabel suspected that the police officer who had urged Teed to speak out critically against him was Tyler. As a result, Schnabel called Tyler into his office

and demanded that Tyler explain the circumstances of his conversation with Teed. Tyler refused to answer any questions until he could have an opportunity to speak with the union attorney. Schnabel badgered and intimidated Tyler, confining him in his office. Schnabel finally allowed Tyler to leave, after suspending him without a hearing. He eventually issued a letter of reprimand to Tyler for refusing to answer the questions. The letter of reprimand contained an inaccurate and misleading description of Tyler's disciplinary record.

Tyler made a written complaint to Rocky Hill town manager Dana Whitman regarding the "interrogation." Whitman was Schnabel's direct supervisor. Tyler also filed a notice of intent to sue for damages for the detention under state and federal law. Articles were published in the Hartford Courant, a newspaper circulated throughout the state, regarding Tyler's allegations. Schnabel attempted to explain his behavior by accusing Tyler of revealing confidential information about an ongoing police investigation by talking to Teed about the hotel clerk. The jury could reasonably have found that this accusation was groundless and pretextual because the information concerning the hotel clerk was well known throughout the town. Indeed, two detectives assigned by Schnabel to investigate the robbery testified that they had been aware of the public nature of the rumor pertaining to the hotel clerk at the time. Schnabel also accused Tyler of placing the safety of a confidential informant in jeopardy, but presented no evidence to support this accusation.

The jury could also have reasonably found that, in a series of incidents following the initial "interrogation," Schnabel subjected Tyler to unwarranted disciplinary proceedings and other harassing and intimidating treatment in retaliation for Tyler's conversation with Teed

and Tyler's speech in response to the interrogation. Some examples of these incidents are summarized as follows.

In March, 1988, Edson Sperry, a town resident, filed a complaint alleging that Tyler had driven through an intersection in his police cruiser at an excessive rate of speed. Schnabel assigned Lieutenant Philip Dunn to conduct an internal investigation. Eventually, Dunn determined that he could not substantiate the complaint. Nevertheless, Schnabel convened a disciplinary board of the police commission to hold a hearing on the matter. The hearing was held, and the board voted to absolve Tyler. Schnabel overruled the board's decision and imposed a one day suspension. Schnabel again significantly misrepresented Tyler's disciplinary record in the notice of suspension.

At a town council meeting in July, 1988, Tyler publicly protested Schnabel's conduct in the Sperry disciplinary proceeding. The New Britain Herald, a local newspaper, also published a letter to the editor by Tyler that was critical of Schnabel. Whitman, the town manager, subsequently overturned Schnabel's suspension of Tyler and exonerated Tyler of all charges relating to the Sperry complaint.

In July, 1988, Tyler attended a meeting of the Rocky Hill public safety committee, the subject of which was the discipline of Tyler arising out of the Sperry complaint. Tyler was on duty that evening, but received permission from his direct supervisor, John Herbst, to attend the meeting. During the meeting, there was a report of an armed robbery, and, on Herbst's direction, a dispatcher, Matthew Yoo, informed Tyler that he was not presently needed but that he should remain ready to leave the meeting if necessary. Shortly thereafter, Yoo informed Tyler that he should respond to the call, and Tyler did so.

Schnabel ordered an investigation of Tyler's conduct, accusing him of not responding immediately to the armed robbery. In the course of that investigation he attempted to coerce Yoo into altering a statement that Yoo had submitted pursuant to the investigation so that the statement would represent that Tyler had been informed that he had been "presently needed" rather than *"not* presently needed." Yoo refused to alter his statement, and provided Tyler with a second statement to this effect. Schnabel asked two detectives, Henry Dodenhoff and Charles Hedeen, to threaten Yoo with arrest if he did not disavow this second statement. Schnabel eventually sought arrest warrants against both Yoo and Tyler on the basis of the claim that they had tampered with physical evidence. Both warrant applications were rejected by the state's attorney's office, and no arrests took place.

In October, 1990, Schnabel attempted to terminate Tyler's employment, alleging that Tyler had been guilty of a continued pattern of misconduct and untruthfulness. Subsequently, he filed a disciplinary notice containing seventeen different charges against Tyler. A neutral fact finder, David Weinstein, was appointed, and he held an evidentiary hearing at which both sides were represented by counsel. Weinstein issued a report, finding that only one of the seventeen charges had merit, and recommending a two day suspension. This one charge related to the fact, acknowledged by Tyler at trial, that Tyler had lied to Schnabel in a meeting the morning after the "interrogation," stating that he had never met with Teed. Tyler testified that he had lied because "I thought the chief would go after me for speaking to Mrs. Teed."

Schnabel's retaliatory activities against Tyler continued after the hearing. In December, 1990, Tyler followed up on another officer's investigation involving the theft of a snowblower by meeting with its owner,

Rosemarie Schaich. She stated to Tyler that the officer originally dispatched to investigate her complaint had indicated that due to budget cuts, the police department would not take fingerprints for such a minor crime. Schaich then went to the police department to complain that her case was not being properly investigated. Corbin and Hedeen wrote out a statement for her, which she signed, distorting and transforming her complaint against the department into a complaint against Tyler. This distortion was Schnabel's idea. Schnabel launched an internal investigation on the basis of this distortion. When Schaich discovered that her complaint had been distorted, she wrote a letter to Schnabel, stating that her complaint was solely against the police department, and indeed that Tyler should be commended for his efforts to help her.

There was evidence that Tyler experienced other incidents of harassing and disparate treatment at the hands of Schnabel. These incidents will be addressed in part V of this opinion.

II

Several preliminary matters should be noted. First, the issue of the application of federal qualified immunity to Tyler's § 1983 claims does not affect the judgment rendered on the common law causes of actions for false imprisonment, intentional infliction of emotional distress and abuse of process. Qualified immunity may serve as a defense to civil suits brought pursuant to § 1983, but not to common law actions predicated on intentional torts. See *Mulligan* v. *Rioux,* 229 Conn. 716, 643 A.2d 1226 (1994).

Second, a claim for qualified immunity from liability for damages under § 1983 "raises a question of federal law"; *Martinez* v. *California,* 444 U.S. 277, 284 n.8, 100 S. Ct. 553, 62 L. Ed. 2d 481 (1980); and not state law. Therefore, in reviewing these claims of qualified

immunity we are bound by federal precedent, and may not expand or contract the contours of the immunity available to government officials. Id.; *Heath* v. *Henning,* 854 F.2d 6, 9 (2d Cir. 1988). Furthermore, in applying federal law in those instances where the United States Supreme Court has not spoken, we generally give special consideration to decisions of the Second Circuit Court of Appeals. *Red Maple Properties* v. *Zoning Commission,* 222 Conn. 730, 739 n.7, 610 A.2d 1238 (1992).[4]

Third, the jury decided the predicate factual issues by answering interrogatories that are necessary for our determination of whether Schnabel is shielded with immunity, but the jury was not instructed on the law of this defense.[5] Schnabel took only one exception to

---

[4] "In deciding to adopt the analysis of the Second Circuit Court of Appeals, we recognize that the decisions of the federal circuit in which a state court is located are entitled to great weight in the interpretation of a federal statute. This is particularly true in 42 U.S.C. § 1983 cases, where the federal statute confers concurrent jurisdiction on the federal and state courts. It would be a bizarre result if this court [adopted the 'arbitrary and capricious' analysis] when in another courthouse, a few blocks away, the federal court, being bound by the Second Circuit rule, required [the *'Roth* entitlement test']. [*Board of Regents* v. *Roth,* 408 U.S. 564, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972).] We do not believe that when Congress enacted the concurrent jurisdiction provision of § 1983 that it intended to create such a disparate treatment of plaintiffs depending on their choice of a federal or state forum." (Internal quotation marks omitted.) *Red Maple Properties* v. *Zoning Commission,* supra, 222 Conn. 739 n.7.

[5] Schnabel initially raised the issue of qualified immunity in a motion for summary judgment, which the trial court refused to consider. Although qualified immunity is an immunity from suit; *Mitchell* v. *Forsyth,* 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985); that should be resolved "at the earliest possible stage in litigation"; *Hunter* v. *Bryant,* 502 U.S. 224, 227, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991); the trial court's refusal to consider the motion was not an abuse of discretion because Schnabel failed to file this motion until the jury had been empaneled, and the trial had begun. See *Allen* v. *Pathmark of Bridgeport, Inc.,* 176 Conn. 124, 130, 405 A.2d 59 (1978). Furthermore, the trial court's refusal to consider the motion did not prejudice Schnabel, because, as indicated in this opinion, the case presented various factual disputes requiring jury determination before the issue of qualified immunity could be assessed. Accordingly, the trial court's denial of Schnabel's motion for a directed verdict, predicated

the jury instructions, which he does not pursue on appeal.[6] Therefore, we have before us all the facts necessary to decide whether Schnabel was shielded by immunity as a matter of law.[7]

## III

To understand fully the contours of the doctrine of federal qualified immunity from liability under § 1983, it is helpful briefly to trace its historical roots and its underlying purposes. The federal courts have long recognized the necessity of protecting government officials from liability in the performance of their discretionary duties. In the context of the potential liability of a school teacher for discretionary acts, the United States Supreme Court pointed out in *Wood* v. *Strickland*, 420 U.S. 308, 319–20, 95 S. Ct. 992, 43 L. Ed. 2d 214 (1975), the following: "Liability for damages for every action which is found subsequently to have been violative of a student's constitutional rights and to have caused compensable injury would unfairly impose upon the school decision maker the burden of mistakes made in good faith in the course of exercising his discretion within the scope of his official duties. School board members, among other duties, must judge whether there have been violations of school regulations and, if so, the appropriate sanctions for the violations. Denying any measure of immunity in these circumstances 'would contribute not to principled and fearless decision-making but to intimidation.' *Pierson* v. *Ray,* [386 U.S. 547, 554, 87 S. Ct. 1213, 18 L. Ed. 2d 288 (1967)]. The imposition of monetary costs for mistakes

---

in part on qualified immunity, was also properly denied. Finally, Schnabel raised the issue in a motion for judgment notwithstanding the verdict. The denial of this motion is the subject of this appeal.

[6] See footnote 10.

[7] In our resolution of the second certified question; see footnotes 3 and 17; we reject Schnabel's claim that the trial court improperly excluded certain evidence pertinent to the § 1983 first amendment claim.

which were not unreasonable in the light of all the circumstances would undoubtedly deter even the most conscientious school decision maker from exercising his judgment independently, forcefully, and in a manner best serving the long-term interest of the school and the students. The most capable candidates for school board positions might be deterred from seeking office if heavy burdens upon their private resources from monetary liability were a likely prospect during their tenure."

The *Strickland* court adopted an objective/subjective test for qualified immunity: "[A government official] is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [person] affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the [person]. That is not to say that [government officials] are 'charged with predicting the future course of constitutional law.' *Pierson* v. *Ray,* [supra, 386 U.S. 557]. A compensatory award will be appropriate only if the [government official] has acted with such an impermissible motivation or with such disregard of the [person's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." *Wood* v. *Strickland,* supra, 420 U.S. 322.

Subsequently, in *Harlow* v. *Fitzgerald,* 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982), the United States Supreme Court perceived problems with the subjective aspects of the *Strickland* test. Although the court continued to recognize the need to vindicate victims of abuse by public officials by awarding damages; see, e.g., *Butz* v. *Economou,* 438 U.S. 478, 506, 98 S. Ct. 2894, 57 L. Ed. 2d 895 (1978); *Bivens* v. *Six Unknown Named Agents of Federal Bureau of Nar-*

*cotics,* 403 U.S. 388, 410, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971); it also recognized the public policy considerations such litigation raises. The *Harlow* court noted that "substantial costs attend the litigation of the subjective good faith of government officials. Not only are there the general costs of subjecting officials to the risks of trial—distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service. There are special costs to 'subjective' inquiries of this kind. Immunity generally is available only to officials performing discretionary functions. In contrast with the thought processes accompanying 'ministerial' tasks, the judgments surrounding discretionary action almost inevitably are influenced by the decisionmaker's experiences, values, and emotions. These variables explain in part why questions of subjective intent so rarely can be decided by summary judgment. Yet they also frame a background in which there often is no clear end to the relevant evidence. Judicial inquiry into subjective motivation therefore may entail broad-ranging discovery and the deposing of numerous persons, including an official's professional colleagues. Inquiries of this kind can be peculiarly disruptive of effective government." *Harlow* v. *Fitzgerald,* supra, 816–17.

Consequently, as the Appellate Court properly recognized, the *Harlow* court formulated an objective standard for immunity from liability under § 1983. "[W]e conclude today that bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery. We therefore hold that government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. See *Procunier* v. *Navarette,* 434 U.S. 555,

565 [98 S. Ct. 855, 55 L. Ed. 2d 24] (1978); *Wood* v. *Strickland,* [supra, 420 U.S. 322]."[8] *Harlow* v. *Fitzgerald,* supra, 457 U.S. 817–18. Furthermore, "[e]ven where the law is clearly established and the scope of an official's permissible conduct is clearly defined, the qualified immunity defense also protects an official if it was objectively reasonable for him at the time of the challenged action to believe his acts were lawful. *Anderson* v. *Creighton,* 483 U.S. 635, 641, 107 S. Ct. 3034, 3039–40, 97 L. Ed. 2d 523 (1987) (explaining *Harlow* v. *Fitzgerald,* [supra, 800]); *Robison* v. *Via,* 821 F.2d 913, 920–21 (2d Cir. 1987) (acknowledging three avenues of relief)." (Internal quotation marks omitted.) *Warren* v. *Dwyer,* 906 F.2d 70, 74 (2d Cir.), cert. denied, 498 U.S. 967, 111 S. Ct. 431, 112 L. Ed. 2d 414 (1990). "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley* v. *Briggs,* 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986).

In sum, federal qualified immunity shields a public official performing discretionary acts from liability if the law was not clearly established at the time of the performance of his or her conduct, or, in the case of clearly established law, if it was objectively reasonable for the public official to believe that his or her acts were lawful in light of the clearly established law. *Anderson* v. *Creighton,* supra, 483 U.S. 639; *Harlow* v. *Fitzgerald,* supra, 457 U.S. 818.

---

[8] In making the determination of whether a particular right was clearly established at the time the defendant acted, three factors must be considered: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the [United States] Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Jermosen* v. *Smith,* 945 F.2d 547, 550 (2d Cir. 1991), cert. denied, 503 U.S. 962, 112 S. Ct. 1565, 118 L. Ed. 2d 211 (1992).

Seizing on the objective focus of the qualified immunity defense, Schnabel argues that in assessing the application of the defense to his conduct we must objectively assess his various employment actions taken against Tyler without considering his intent to retaliate against Tyler for the exercise of his constitutional rights, or to single out Tyler maliciously for disparate treatment. Although the federal qualified immunity defense precludes any consideration of the motives of the defendant; *Harlow* v. *Fitzgerald,* supra, 457 U.S. 817–18; *"Harlow* does not require us, as [Schnabel] would have it, to ignore the fact that intent is an element of the relevant cause of action" in making our determination of whether the law was clearly established. *Musso* v. *Hourigan,* 836 F.2d 736, 743 (2d Cir. 1988). Schnabel's interpretation of the qualified immunity defense would completely undermine any first amendment challenge, or other constitutional violation predicated on an element involving intent, and, consequently, is not the law. *Frank* v. *Relin,* 1 F.3d 1317, 1330–31 (2d Cir.), cert. denied,    U.S.    , 114 S. Ct. 604, 126 L. Ed. 2d 569 (1993); *Bieluch* v. *Sullivan,* 999 F.2d 666, 672 (2d Cir. 1993), cert. denied,    U.S.    , 114 S. Ct. 926, 127 L. Ed. 2d 219 (1994); *Musso* v. *Hourigan,* supra, 743.

Accordingly, we must consider Schnabel's intent in determining whether the law was clearly established on the two underlying constitutional violations for the § 1983 causes of action. For a public employer to violate the first amendment, as is alleged in this case, there must be adverse employment action taken with the purpose of either inhibiting the employee's constitutionally protected speech of public concern or punishing the employee for that speech. See part IV of this opinion. Similarly, the equal protection violation alleged in this case requires proof that Tyler was treated differently than others

who were similarly situated because of an invidious motive. See part V of this opinion.

## IV

In his first claim of qualified immunity, Schnabel seeks immunity from Tyler's claim that he was retaliated against for his constitutionally protected speech, critical of Schnabel, in violation of the first and fourteenth amendments to the federal constitution. Although our reasoning differs somewhat, we agree with the Appellate Court that Schnabel is not entitled to qualified immunity from liability for this claim.

"It is well settled that persons do not relinquish their first amendment rights to comment on matters of public interest by becoming government employees. *Rankin* v. *McPherson,* 483 U.S. 378, 383–84 [107 S. Ct. 2891, 97 L. Ed. 2d 315] (1987); *Connick* [v. *Myers,* 461 U.S. 138, 140, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)]; *Pickering* [v. *Board of Education,* 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)]. It also has been recognized that the government has a legitimate interest in regulating the speech of its employees that differs significantly from its interest in regulating the speech of people in general. Id." *Piesco* v. *New York Dept. of Personnel,* 933 F.2d 1149, 1155 (2d Cir.), cert. denied, 502 U.S. 921, 112 S. Ct. 331, 116 L. Ed. 2d 272 (1991).

In order to accommodate these competing interests, "the 'clearly established law' surrounding first amendment-rights of public employees follows not a bright-line rule, but a balancing test."[9] *Bieluch* v. *Sullivan,*

---

[9] The law must be clearly established as of the date of the government official's conduct. *Vasbinder* v. *Ambach,* 926 F.2d 1333, 1341 (2d Cir. 1991). The Second Circuit Court of Appeals has repeatedly held that the rule of *Pickering* v. *Board of Education,* supra, 391 U.S. 563, as refined by subsequent Supreme Court cases, is clearly established in its relation to specific factual circumstances that predate the occurrences that underlie the present

supra, 999 F.2d 670. Tyler must establish that: (1) his "speech can be fairly characterized as constituting speech on a matter of public concern"; and (2) "[the] speech was at least a substantial or motivating factor in the discharge . . . ." (Internal quotation marks omitted.) *Frank* v. *Relin,* supra, 1 F.3d 1328, 1328–29. If both of these elements are proven by Tyler, Schnabel may still avoid liability if he establishes that either: (3) he "would have made the same decision in the absence of the protected conduct"; or (4) Tyler's conduct interfered with the police department's " 'effective and efficient fulfillment of its responsibilities to the public . . . .' " Id., 1329.

Because this analysis requires the application of a balancing test, we cannot determine whether the law was clearly established in the abstract. Rather, the

case. *Piesco* v. *New York Dept. of Personnel,* supra, 933 F.2d 1155, 1161 (conduct took place in 1985); *Vasbinder* v. *Ambach,* supra, 1341 (conduct took place in 1982). Nevertheless, Schnabel argues in passing that there was no clearly established right in employment retaliation cases as of 1988, the date that Schnabel's retaliatory activities began, to be free of retaliatory employment action that falls short of a discharge. He relies on *Hughes* v. *Whitmer,* 714 F.2d 1407 (8th Cir. 1983), cert. denied sub nom. *Hughes* v. *Hoffman,* 465 U.S. 1023, 104 S. Ct. 1275, 79 L. Ed. 2d 680 (1984), but his reliance is misplaced. In *Hughes,* the court stated that "[a]dmittedly, a transfer traceable to speech-related activity is properly the subject of first amendment challenge, even though the transfer resulted in no loss of pay, seniority, or other benefit." Id., 1421. Other precedents have clearly established that public employers risk liability for *retaliation,* including employment action short of discharge, for the constitutionally protected activities of their employees. *Donahue* v. *Board of Fire Commissioners,* 834 F.2d 54, 59 (2d Cir. 1987) ("a pattern of harassment," including wrongful retention of personal diary and disclosure of contents to others, could violate first amendment); *Yoggerst* v. *Stewart,* 623 F.2d 35, 39 (7th Cir. 1980) (verbal reprimand and notation in personnel file).

Schnabel also argues that the Seventh Circuit Court of Appeals has held that a constitutional provision that requires a balancing of interests rarely creates a clearly established right. *Benson* v. *Allphin,* 786 F.2d 268, 276 (7th Cir.), cert. denied, 479 U.S. 848, 107 S. Ct. 172, 93 L. Ed. 2d 109 (1986). This, however, is not the law of the Second Circuit. See, e.g., *Bieluch* v. *Sullivan,* supra, 999 F.2d 670–72; *Piesco* v. *New York Dept. of Personnel,* supra, 933 F.2d 1161; *Vasbinder* v. *Ambach,* supra, 926 F.2d 1341.

question requires that we examine carefully the particular facts and circumstances of the case. *Giacalone* v. *Abrams,* 850 F.2d 79, 85 (2d Cir. 1988) ("[t]he contours of the right must be sufficiently clear that a reasonable official would understand that *what he is doing* violates that right" [emphasis in original; internal quotation marks omitted]); see *Elder* v. *Holloway,*     U.S.     , 114 S. Ct. 1019, 1022, 127 L. Ed. 2d 344 (1994). " 'This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.' " *Piesco* v. *New York Dept. of Personnel,* supra, 933 F.2d 1160, quoting *Anderson* v. *Creighton,* supra, 483 U.S. 640.

We must first determine whether Tyler's speech may fairly be characterized as constituting speech on a matter of public concern. *Piesco* v. *New York Dept. of Personnel,* supra, 933 F.2d 1155. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." (Internal quotation marks omitted.) *Rankin* v. *McPherson,* supra, 483 U.S. 384–85. Because of the special considerations applicable to the employer-employee relationship, there can be speech that, although protected by the first amendment, may be a constitutionally permissible justification for employment discipline or discharge because it is speech not of public concern. *Connick* v. *Myers,* supra, 461 U.S. 147. "[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." Id. In this regard, Schnabel argues that

Tyler's speech concerned a mere personal dispute between him and his employer, rather than an issue of public concern. We disagree.

At trial, Tyler claimed that five different instances of his speech were related to matters of public concern and were the basis for retaliation by Schnabel: (1) Tyler's conversation with Teed in February, 1988, concerning the police department rumor; (2) the written complaint sent by Tyler to the town manager in April, 1988, alleging that Schnabel had abused his authority; (3) Tyler's public statements made to the town council concerning the Sperry complaint and disciplinary board hearing; (4) Tyler's September, 1988 letter to the editor of the New Britain Herald; and (5) Tyler's filing of the notice of intent to sue, the counterclaim and other pleadings in the present case.[10]

As for Tyler's conversation with Teed, there was a factual dispute regarding the content of this conversation, and accordingly the trial court instructed the jury that it should resolve this factual dispute to determine whether the speech involved a matter of public concern. The jury's findings, read in conjunction with

---

[10] The trial court instructed the jury that, as a matter of law, Tyler's filing of the notice of intent to sue, the counterclaim and any other pleadings in the present case constituted speech protected by the first amendment. Although Schnabel objected to this instruction at trial, he does not make any claim on appeal in this regard. The trial court also instructed the jury that it was required to determine whether the other four instances of speech constituted protected conduct, including Tyler's written letters to the town manager and to the New Britain Herald. We agree with Schnabel that the issue of whether Tyler's written communications constituted protected conduct should not have been given to the jury, as their content was undisputed, and therefore the question was one of law. Schnabel argues that this "fundamental procedural infirmity" requires that we revise the judgment in this case, despite the fact that he did not object to this instruction before the trial court. We determine, however, as a matter of law, that all of these statements involved a matter of public concern. Consequently, Schnabel has not been harmed in any way by the jury instructions that he claims were objectionable.

the jury instructions, indicate that the jury determined that the content of this communication did not consist of confidential information regarding a police investigation, as claimed by Schnabel, but instead was speech concerning police response to citizen complaints and public perception of that response.[11]

As indicated previously, evidence at trial supported this finding. There was testimony that the conversation concerned Teed's perception, shared by some ele-

---

[11] The trial court instructed as follows: "[T]here exists an issue of fact as to Mr. Tyler's conversation with Mrs. Teed on February 18, 1988. Mr. Tyler claims that he spoke to Mrs. Teed concerning police response to citizen complaints and public perceptions of that response, and that he encouraged Mrs. Teed to speak at the town council meeting that night and express those concerns, specifically by relating the story of the clerk at the Travelers Motor Lodge. If you believe Mr. Tyler's version of this conversation, then it constitutes protected speech. If you believe, on the other hand, that Mr. Tyler divulged confidential information about an ongoing investigation to Mrs. Teed, it is not protected speech."

The relevant portion of the jury interrogatories and answers provided the following, with interrogatory 1. (b) addressing this particular issue of fact:

"1. Do you find that any of the following was protected speech or activity engaged in by Mr. Tyler, as I have previously defined it, and that such speech or activity was a substantial or motivating factor in any alleged retaliatory actions taken against him by Mr. Schnabel?

|  | YES | NO |
|---|---|---|
| ". . . | | |
| "b. speech to Mrs. Teed 2/18/88 | X | ___ |
| "c. letters sent to the town manager in April, 1988, Defendant's Exhibits 145 and 146. | X | ___ |
| "d. statements made to town council members concerning the disciplinary board hearing on the Sperry complaint in July and August, 1988. | X | ___ |
| "e. September 2, 1988 letter to the editor | X | ___ |

"2. If you answered 'yes' as to any speech listed in No. 1, do you find that such actions taken against Mr. Tyler by Mr. Schnabel would have been taken anyway, even in the absence of Mr. Tyler's protected speech?

"_____Yes: Verdict for . . . Schnabel

" X No: Verdict for . . . Tyler"

ments of the community, that the Rocky Hill police department would not readily respond to citizen complaints involving minority suspects for fear of charges of racism. During this conversation, Tyler encouraged Teed to speak out regarding her criticism of the police department at a town council meeting that night.[12]

There is essentially no dispute regarding the content and context of the remaining instances of speech, each of which concerned allegations by Tyler that Schnabel was mismanaging and abusing his office by singling out Tyler for harsh treatment in retaliation for Tyler's speech. In his letters to the editor and to town manager Whitman, Tyler claimed that Schnabel was untruthful, and had abused his authority through misconduct including the interrogation and detention to which Schnabel had subjected him. Tyler further claimed that the circumstances of this detention violated employment rights and may have violated a criminal statute. Although each of the instances of Tyler's speech subsequent to the conversation with Teed involved a continuing dispute between Tyler and his employer, it would be anomalous to hold that Tyler's conversation with Teed was of public concern, but that Tyler's complaints regarding Schnabel's retaliation against him for this conversation were not. Therefore, as in *Piesco* v. *New York Dept. of Personnel,* supra, 933 F.2d 1157, "this case can be readily distinguished from those cases where a disgruntled employee voluntarily comments on an employment-related matter out of a personal interest."

---

[12] Schnabel claimed at trial and claims in this court that Tyler's speech constituted a personal dispute, and not a matter of public concern. The jury rejected that claim with respect to the factually disputed instances of speech, and we reject that claim with respect to Tyler's written communications. Schnabel does not claim that, even if Tyler's speech did involve a matter of public concern, he reasonably believed that the speech did not involve a matter of public concern under the circumstances surrounding the speech. See *Waters* v. *Churchill,*    U.S.    , 114 S. Ct. 1878, 1888–89, 128 L. Ed. 2d 686 (1994).

The fact that Tyler's speech involved a controversial topic in Rocky Hill does not render it constitutionally unprotected. "The inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern. [D]ebate on public issues should be uninhibited, robust, and wide-open, and . . . may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." (Internal quotation marks omitted.) *Rankin* v. *McPherson,* supra, 483 U.S. 387. In *Rankin,* the United States Supreme Court held that a law enforcement employer violated the constitutional rights of a constable by discharging her in retaliation for her statement to a coworker, made shortly after the attempted assassination of President Reagan, that " 'if they go for him again, I hope they get him.' " Id., 381.

Nor does the private nature of Tyler's conversation with Teed and his letter to the town manager undermine Tyler's claim that his speech involved a matter of public concern. *Givhan* v. *Western Line Consolidated School District,* 439 U.S. 410, 415–16, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979); *Rookard* v. *Health & Hospitals Corp.,* 710 F.2d 41, 46 (2d Cir. 1983). "The First Amendment forbids abridgement of the freedom of speech. Neither the Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public. We decline to adopt such a view of the First Amendment." *Givhan* v. *Western Line Consolidated School District,* supra, 415–16.

The second requirement that Tyler was required to prove in order to establish a violation of clearly established law is that his speech was at least a substantial or motivating factor in the employment actions taken by Schnabel. This determination was dependent

upon disputed facts that were resolved by the jury in favor of Tyler in answers to specific interrogatories.[13] Furthermore, the Appellate Court concluded, from its own independent review of the record, that the jury's finding of causation was supported by the evidence. *Schnabel* v. *Tyler,* supra, 32 Conn. App. 719.[14] Before this court, Schnabel does not challenge this determination.

Because he established that his speech related to a matter of public concern and that it was a substantial factor in causing Schnabel to take the employment action against him, Tyler established a prima facie case that his first amendment rights were violated. *Frank* v. *Relin,* supra, 1 F.3d 1328–29. This shifted the burden to Schnabel to establish that he would have taken the same personnel action against Tyler in the absence of the protected conduct or that Tyler's conduct interfered with the efficient fulfillment of his employer's responsibilities to the public. Id.

Schnabel failed to establish the first of these two alternatives. The jury specifically found by way of interrogatory that Schnabel would not have taken the

[13] The trial court instructed the jury as follows: "In order to prove his first amendment claim, Mr. Tyler must establish that his exercise of protected speech was a substantial or motivating factor, not necessarily the primary reason or the dominant purpose, but a substantial factor in Mr. Schnabel's decision to take the various actions complained of by Mr. Tyler in this case." On this issue, the jury answered specific interrogatories, directed to each instance of Tyler's speech. See footnote 11.

[14] "Our independent review of the record indicates that the jury could reasonably infer from the evidence that [Schnabel] responded to [Tyler's] exercise of his free speech rights with conduct meant to punish him and not, as [Schnabel] claims, to promote the harmony of the police department. It also reasonably inferred a retaliatory motive on the part of [Schnabel]. No other officers were treated in the same manner as [Tyler]. Prior to [Tyler's] remarks his performance record was relatively clean. [Schnabel] refused to remove overruled disciplinary charges from [Tyler's] record and he repeatedly attempted to terminate [Tyler's] employment over a period of three years following Teed's criticisms at the town meeting." *Schnabel* v. *Tyler,* supra, 32 Conn. App. 719–20.

employment actions against Tyler in the absence of Tyler's protected speech.[15] On appeal to this court, Schnabel does not challenge this finding.

Under the second alternative, the constitutional balancing test, "the employee's interest in expressing herself . . . must not be outweighed by any injury the speech could cause to the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." (Internal quotation marks omitted.) *Waters* v. *Churchill,*      U.S.     , 114 S. Ct. 1878, 1884, 128 L. Ed. 2d 686 (1994); *Connick* v. *Myers,* supra, 461 U.S. 142; see *Pickering* v. *Board of Education,* supra, 391 U.S. 568. This balancing test recognizes the important distinction between the restriction of speech by the government as a sovereign and as an employer. "The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate." *Waters* v. *Churchill,* supra, 1888.

In balancing the employee's interests against those of the state, "[t]he [speech] at issue will 'not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose.' [*Rankin* v. *McPher-*

---

[15] The trial court instructed the jury as follows: "Once Mr. Tyler has established that his exercise of protected speech was a substantial or motivating factor in Mr. Schnabel's decision to take actions against him, the burden then shifts to Mr. Schnabel to prove that, even in the absence of his protected speech, such actions would have been taken anyway."

The jury found that Schnabel did not meet his burden by answering "No" in response to an interrogatory addressing this issue. See footnote 11.

*son,* supra, 483 U.S. 388]." *Piesco* v. *New York Dept. of Personnel,* supra, 933 F.2d 1155. "[P]ertinent considerations [include] whether the [speech] impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise. [*Pickering* v. *Board of Education,* supra, 391 U.S. 570–73]." *Rankin* v. *McPherson,* supra, 388. "[I]t is the court's task to apply the [*Pickering/Connick*] test to the facts." *Waters* v. *Churchill,* supra, 114 S. Ct. 1884.[16]

Furthermore, we agree with Schnabel that special considerations apply when the government employer is a police or fire department, because of the "esprit de corps" and emphasis on discipline that are unique to these entities and necessary to their effective functioning. *Donahue* v. *Board of Fire Commissioners,* 834 F.2d 54, 58 (2d Cir. 1987); *Hughes* v. *Whitmer,* 714 F.2d 1407, 1419 (8th Cir. 1983); *Janusaitis* v. *Middlebury Volunteer Fire Dept.,* 607 F.2d 17, 26 (2d Cir. 1979).

We conclude, however, that the constitutional scales balance in Tyler's favor.[17] On appeal, although Schnabel

---

[16] At trial, the trial court instructed the jury, over Tyler's objection, that it must balance the employee's and employer's respective interests in determining whether Tyler's free speech rights had been violated. Schnabel did not object to this instruction, and makes no claim regarding the propriety of this instruction. The jury interrogatories do not contain any reference to this balancing analysis. The statement in *Waters* v. *Churchill,* supra, 114 S. Ct. 1884, that the court must do the constitutional balancing would appear to support Tyler's argument. Nevertheless, because we undertake our own constitutional balancing in this opinion, we need not further consider the merit of this instruction.

[17] In the second certified question; see footnote 3; Schnabel claims that the scales of the balancing test were improperly weighted because of the exclusion of certain evidence by the trial court. Schnabel argues broadly that the trial court "prohibited testimony from the chief regarding the paramilitary nature of a police department, the special significance of discipline, rank and esprit d'corps, and the special purpose of orders and regu-

argues at length regarding the special disciplinary and other needs of the Rocky Hill police department, he does not present a single example of how Tyler's speech interfered with the functioning of the department. At trial, Schnabel did not present evidence to the jury that Tyler's speech interfered in any way with the efficiency of operations at the Rocky Hill police department, interfered with the performance of his duties, or impaired harmony among workers. Schnabel presented no evidence that Tyler's speech contributed to dissension in

lations in such an organization." Tyler argues that when the trial court's rulings are examined in their context it is clear that the trial court did not abuse its discretion because, although it sustained objections to certain broad questions on grounds of relevance or form, it eventually allowed testimony on each of the subjects that Schnabel claims were excluded. We agree with Tyler.

The questions asked of Schnabel were entirely open-ended and could have elicited irrelevant narrative evidence. For example, the first question asked was the following: "When you began work, were you informed of any particular problems within the Rocky Hill Police Department?" Schnabel began to answer: "Many problems that range from all types of police misconduct, including police brutality—." The trial court sustained Tyler's objection to this question, on the ground that its overbroad form could elicit entirely irrelevant evidence.

Although the jury was excused, Schnabel did not request an opportunity to make an offer of proof as to the content of the testimony he sought to elicit. Instead, the jury returned and Schnabel's counsel made a series of attempts to fashion a question less broad. An example of one of these attempts demonstrates that the trial court did not abuse its discretion in its rulings: "Mr. Schnabel, can you describe in your own words the operation of a police department?"

Finally, Schnabel's counsel was able to craft questions that enabled his client to testify as to the organizational similarity between a police department and a military organization, why discipline within a police department is important, and the function of police department orders and regulations in guiding police behavior. Absent an offer of proof at trial; *Johnson* v. *Newell,* 160 Conn. 269, 277, 278 A.2d 776 (1971); there is no way to ascertain what additional relevant testimony Schnabel was prohibited from introducing, if any. Indeed, even before this court, Schnabel has not identified what specific testimony he would have presented beyond that which was admitted by the trial court. Accordingly, we conclude that there is no merit to this claim.

the ranks of the police department. See *Donahue* v. *Board of Fire Commissioners,* supra, 834 F.2d 58.

The only connection between Tyler's speech and the important state interest in effective operations that Schnabel sought to draw was Schnabel's allegation that Tyler revealed confidential information to Teed. This allegation, however, was rejected by the jury. See footnote 11.

The remaining potential factors in the balance involve impairment of discipline, and the relationship between employee and employer. Of course, it is undisputed in this case that the relationship between Schnabel and Tyler dramatically deteriorated following Tyler's speech. Nevertheless, the evidence at trial supports the inference that their relationship deteriorated precisely because Schnabel was retaliating against Tyler for his speech. "Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." *Rankin* v. *McPherson,* supra, 483 U.S. 384. Accordingly, we conclude that Schnabel violated clearly established law in retaliating against Tyler for his protected conduct.

Turning to the second prong of qualified immunity— whether it was objectively reasonable for Schnabel to believe his acts were lawful in view of the clearly established law—we conclude that Tyler's various communications with regard to a major controversy in Rocky Hill were "of such clear public concern that it would not be reasonable for [Schnabel] to conclude that it was lawful to discharge or otherwise retaliate against [Tyler]." *Piesco* v. *New York Dept. of Personnel,* supra, 933 F.2d 1161. Furthermore, in view of the lack of evidence that Tyler's speech in any way interfered with

efficient operations at his workplace,[18] we determine that no reasonable officer in Schnabel's position could have concluded that his intentional retaliation against Tyler's speech would survive constitutional scrutiny. Id. Therefore, the objective reasonableness prong of *Harlow* v. *Fitzgerald,* supra, 457 U.S. 817–18, does not provide a basis for qualified immunity against the first amendment claim.

## V

The remaining issue is whether Schnabel was entitled, as a matter of law, to qualified immunity on Tyler's claim that his right to equal protection was violated. This claim is based on evidence that Schnabel singled out Tyler for different treatment from that received by other officers because of Schnabel's bad faith intent to injure Tyler. Schnabel claims that the constitutional right referred to by the trial court does not exist. We disagree. We determine that there existed

---

[18] The Appellate Court did not discuss the second prong of qualified immunity—whether it was objectively reasonable for Schnabel to believe his acts were lawful in view of the clearly established law—apparently based on the view that the clearly established law prong was dispositive of the qualified immunity defense. *Schnabel* v. *Tyler,* supra, 32 Conn. App. 721. As previously discussed, however, the clearly established prong and the objective reasonableness prong are *alternative* grounds for qualified immunity. *Warren* v. *Dwyer,* supra, 906 F.2d 74. Accordingly, Schnabel would be entitled to qualified immunity, despite the fact that the law was clearly established, if it were shown that his conduct was objectively reasonable under the circumstances.

Nevertheless, because the first amendment balancing test requires a fact bound analysis to determine whether the law is clearly established, there is a significant overlap between the clearly established law prong and the objective reasonableness prong of the qualified immunity defense in the present case. Indeed, Schnabel does not claim that any of the factual circumstances of this case are relevant solely to the objective reasonableness prong. An example of a circumstance that might entitle a public official to qualified immunity in a first amendment case although the law had been clearly established is the public official's reasonable reliance on the advice of counsel. See, e.g., *Jennings* v. *Joshua Independent School District,* 877 F.2d 313, 318 (5th Cir. 1989).

clearly established law setting out this right and that the evidence sufficiently supports a violation of this right.

In *LeClair* v. *Saunders,* 627 F.2d 606, 608 (2d Cir. 1980), dairy farm owners claimed that a dairy farm inspector had singled out their farm for selective enforcement pursuant to an admittedly lawful state regulation based on an invidious purpose. The farmers did not "allege an unconstitutional state statute or regulation that impermissibly classifies dairy farms into different categories." Id. Furthermore, the farmers did not allege that the discrimination against them was in retaliation for the exercise of any constitutional right. Id. The farmers fell into no suspect class or even into any classification whatsoever—they simply alleged that they were the victims of selective enforcement. The Second Circuit stated the applicable rule of law: "[L]iability in the instant type of equal protection case should depend on proof that (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, *or malicious or bad faith intent to injure a person.*" (Emphasis added.) Id., 609–10;[19] see *FSK Drug Corp.* v. *Perales,* 960 F.2d 6, 10 (2d Cir. 1992) (reaffirming rule set out in *LeClair*); *Falls* v. *Dyer,* 875 F.2d 146, 149 (7th Cir. 1989) (town could not, consistent with equal protection clause, maliciously single out storeowner for enforcement of law against display of portable signs); *Moran* v. *Bench,* 353 F.2d 193, 194 (1st Cir.), cert. denied, 384 U.S. 906, 84 S. Ct. 1341, 16 L. Ed. 2d 359 (1965); see also *Snowden* v. *Hughes,* 321 U.S.

[19] Thus, Schnabel's claim in his brief, in reliance on *LeClair* v. *Saunders,* supra, 627 F.2d 606, that there can be no equal protection violation unless the "selective treatment [is] based on constitutionally impermissible considerations" is meritless.

1, 8, 64 S. Ct. 397, 88 L. Ed. 497 (1943). Therefore, we determine that there existed clearly established law at the time of Schnabel's conduct.

The question of whether Schnabel violated this clearly established law was fact bound and has been resolved by the jury. The jury was instructed as follows: "Mr. Tyler can prove his equal protection claim if he establishes that he, compared with others similarly situated, was treated differently, and that such treatment was based upon *malicious or bad faith intent to injure him;* and that such treatment had no legitimate relationship to a rational state interest." (Emphasis added.) Schnabel did not object to this instruction. The Appellate Court held that the evidence was sufficient to support the jury's finding for Tyler on this factual issue; *Schnabel* v. *Tyler,* supra, 32 Conn. App. 720–21; and Schnabel does not challenge that determination before this court.

Next, we must determine if it was objectively reasonable for Schnabel to believe that he was not in violation of this clearly established law. It is true that the court in *LeClair* rejected the limited evidence of malice in that case, holding that the "malice/bad faith standard should be scrupulously met" when the discrimination does not involve classes or groups but individuals. "If [the public official] went after Mr. LeClair to *get him,* for any reason, then he should be liable." (Emphasis in original.) *LeClair* v. *Saunders,* supra, 627 F.2d 611.

Nevertheless, in the present case the evidence of malice presented to the jury rose to the level that no reasonable officer in Schnabel's shoes could have believed that he was acting in a lawful manner. This evidence included: Schnabel's order, over Tyler's protests, that Tyler, without being allowed to wear his gun, handcuffs, nightstick or radio, guard a hospitalized Somers prison inmate who had a history of vio-

lence, which was contrary to ordinary procedures and placed Tyler in a dangerous situation; Schnabel's order that Tyler sit on a humiliating, uncomfortable stool while Schnabel publicly ridiculed Tyler regarding this assignment; Schnabel's repeated excessive disciplining of Tyler for infractions that were either minor or wholly unfounded; and Schnabel's repeated misrepresentations of Tyler's disciplinary record. Under these circumstances, Schnabel is not entitled to qualified immunity as a matter of law.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.